**Jacquelyn HILL, Ind. & ex rel. All Others Similarly Situated, Plaintiffs-Appellants,**

v.

**K–MART CORPORATION, Defendant-Appellee.**

No. 80–3838.

United States Court of Appeals, Fifth Circuit.

March 11, 1983.

Hunt & Jamison, Eugene Hunt, Pine Bluff, Ark., Ronald L. Ellis, New York City, for plaintiffs-appellants.

Milling, Benson, Woodard, Hillyer & Pierson, Michael J. Molony, Jr., New Orleans, La., for defendant-appellee.

Before CLARK, Chief Judge, POLITZ and RANDALL, Circuit Judges.

POLITZ, Circuit Judge:

Invoking Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq., and the Civil Rights Act of 1866, 42 U.S.C. § 1981, Jacquelyn Hill, a black female, charged her former employer, K-Mart Corporation, with employment discrimination based on race

and sex. A lengthy bench trial was held, and the district court dismissed Hill's individual and class action. We affirm.

## Background Facts

Hill began her employment with K-Mart in November 1973 in the candy and delicatessen department of its Pine Bluff, Arkansas store. In March 1975 Hill was accepted into K-Mart's Management Training Program. In August 1975, following orientation at a Little Rock store, Hill was promoted to Assistant Manager and transferred to K-Mart's newest store in Shreveport, Louisiana.

For the next 21 months, Hill continued in the Management Training Program at the Shreveport store. During that period she and the other assistant managers were periodically rotated throughout the various store departments as part of the training process. Hill's performance consistently earned her high ratings and regular salary increases.

In May 1977 Hill received notice of a transfer to a K-Mart location in Jackson, Mississippi. A white male assistant manager who had, like Hill, worked in the Shreveport store for 21 months simultaneously received a transfer notice. Assistant managers routinely were transferred after serving 18 to 24 months in a store. Hill declined the transfer for personal reasons and on May 23, 1977, she resigned. After resigning, Hill wrote John Lynch, Regional Personnel Manager, requesting a "resident" assistant manager position in the Pine Bluff store. Lynch made inquiry and recommended Hill to the Arkansas region manager. There were no openings; Lynch's efforts to assist Hill were unsuccessful.

Within two weeks after quitting K-Mart, Hill filed discrimination charges with the Equal Employment Opportunity Commission. After receipt of the right-to-sue letter she filed the instant complaint. Hill's class action charged a pervasive pattern of sexual and racial discrimination in the three K-Mart stores in the Shreveport/Bossier City area. Her individual claim charged that K-Mart subjected her to unlawful treatment.

## Individual Claim

Hill alleged that: (1) her authority was undermined because of her race and sex, (2) she was singled out and harassed, (3) she was constructively discharged, and (4) her pay was discriminatory. Her complaints at trial focused on various incidents which, Hill claims, amounted to invidious discrimination.

Shortly after beginning her Shreveport assignment, Hill began to experience problems with an employee in the plant department who was working under her supervision. This employee refused to obey Hill's instructions and at one point referred to her using a racial slur. Hill reported the employee to Store Manager McDaniel for drinking on the job, improper behavior toward female employees, and insubordination, including the racist remark. McDaniel was new and not familiar with the store's employees. He immediately investigated the matter. The employee denied any wrongdoing, but when McDaniel detected the odor of alcohol on the employee's breath he fired him. The employee worked less than 10 days.

In December 1975, a few months after arriving in Shreveport, Hill experienced similar difficulties with a white female employee she upbraided for inadequate work performance. That employee approached McDaniel in tears and referred to Hill in racist terms. McDaniel ordered the employee to "cool off," but when the employee left the store premises without permission, McDaniel sent a discharge order to the personnel office. The next day McDaniel began a vacation. Upon his return he discovered that the personnel director had not fired the employee but had transferred her to another department. McDaniel reprimanded the personnel director but took no further action against the offending employee.

In the fall of 1976, Hill encountered difficulties with a white male subordinate, Bill

Brooks, manager of the plant department. Brooks at times ignored Hill's orders. McDaniel considered Brooks a valued employee, crediting the plant department's notable success to Brooks' experience and creativity. McDaniel consistently accorded Brooks considerable latitude in the management of his department. Brooks was noted for his on-going confrontations with assistant managers—black and white, male and female—and his persistent ability always to come out on top, giving him, as the district court observed, a "charmed existence."

When McDaniel could not mediate the dispute between Hill and Brooks he rotated the assistant manager, a personnel management technique used before and after. Six months later Hill complained to McDaniel that Brooks was watching her while she supervised a sidewalk sale. McDaniel assured Hill that Brooks, in the absence of the regular security guard, had been assigned to watch the entire outdoor sales area for security purposes and that she was not under personal surveillance.

Because of these incidents, Hill maintained that K-Mart undermined her authority and denied her the respect to which she was entitled. The district court was not persuaded that the incidents amounted to intentional discrimination in Hill's terms, conditions, or privileges of employment. Nor are we.[1]

Two of the incidents involved race. The court observed that the handling of the incidents of racial remarks left something to be desired. On both occasions McDaniel based his disciplinary decision on grounds other than racism or insubordination and, in one of the instances, allowed the offending employee to remain employed after ordering her dismissed. But Hill has not proved that the incidents had any significant impact on her position or authority. The only evidence of a negative effect was Hill's conclusional statement that the two episodes placed her in a bad light. The record as a whole, including evaluations and testimony from other employees, established that Hill's tenure after the racial slurs—the second occurring one and one-half years before her resignation—was successful and indicated no lack of respect or dignity. We are convinced that Hill stood above the remarks and her position or authority suffered nothing because of them. Hill has not shown that her perceived loss of respect in fact occurred among her subordinates or that McDaniel's response constituted official approval of racist behavior.[2] Nor does the record support a finding that these isolated incidents resulted in an atmosphere charged with racist overtones and racial tension, see *Rogers v. Equal Employment Opportunity Commission,* 454 F.2d 234 (5th Cir.1971), *cert. denied,* 406 U.S. 957, 92 S.Ct. 2058, 32 L.Ed.2d 343 (1972), sufficient to taint the terms, conditions, or privileges of her employment.

Hill also maintained that her difficulties with Brooks undermined her authority. We are not persuaded. Brooks apparently treated all assistant managers equally—with measured disdain. Brooks' intransigence was extended to all alike. *See Vaughn v. Pool Offshore Co.,* 683 F.2d 922 (5th Cir.1982) (offensive harassment, shared equally by all, not considered actionable discrimination).

1. Hill also argues that the defendant slighted her in other ways, alleging that McDaniel ignored recommendations for promotions and neglected to page her for meetings. The record does not bear out an invidious nature to these assertions. Hill testified that some employees, black and white, whom she recommended were in fact promoted. Others were not. Although Hill charged that McDaniel demoted an employee under her supervision without her knowledge, the court found from testimony and Hill's signature on the demotion notice that she had in fact been present. The court further found that McDaniel had overlooked paging Hill for informal assistants' meetings on only two occasions out of almost 100 such meetings. Both times McDaniel apologized to Hill.

2. Perhaps reflective of Hill's hypersensitivity is her insistence that the plant department employee was not dismissed until months after the offensive conduct. Documentary evidence and testimony conclusively show that the employee was fired immediately, after only nine days on the job.

Hill had no further difficulties with Brooks for six months after the initial encounter, when she became upset because she thought Brooks had her under surveillance during a sidewalk sale. McDaniel told Hill, and reiterated at trial, that he had ordered surveillance of the sale, both customers and employees, because of an upsurge in missing inventory and the obvious heightened exposure to loss involved in an outside sale. When McDaniel learned that his regular security officer was off-duty, he directed Brooks to watch the sale area, citing Brooks' experience with problems of outdoor security in his plant department. We cannot find that the sidewalk sale incident constituted harassment directed at Hill or that it involved race or sex.

Hill's final complaint is that she was constructively discharged. We are not persuaded that the employment milieu, including the relationship with superiors, co-equals, and subordinates, presented a situation " 'so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign,' " *Bourque v. Powell Electrical Manufacturing Co.,* 617 F.2d 61, 65 (5th Cir.1980) (*quoting Alicea Rosado v. Garcia Santiago,* 562 F.2d 114, 119 (1st Cir.1977)). Thus, Hill has not shown that she was constructively discharged. Most of the incidents took place long before her resignation. Testimony of co-workers and Hill's letters to Lynch indicate that her primary basis for resigning was the transfer to Jackson, a location more inconvenient to her husband's home in Arkansas than Shreveport or the Arkansas stores. As indicated above, such transfers were standard K-Mart policy, and no showing was made that this one was unusual or unreasonable or in any way motivated by race or sex. Hill was entitled to resign for any reason she deemed sufficient but cannot convert that decision into a "constructive discharge" absent the impermissible factors. *Junior v. Texaco, Inc.,* 688 F.2d 377 (5th Cir.1982).

There should be little need to repeat the reminder that in all things and at all times Hill carried "the ultimate burden of persuading the court that she [had] been the victim of intentional discrimination." *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 256, 101 S.Ct. 1089, 1095, 67 L.Ed.2d 207 (1981).[3] We concur in the district court's conclusion that Hill did not discharge the burden of establishing that she was the victim of unlawful discrimination. *See Pouncy v. Prudential Insurance Co. of America,* 668 F.2d 795 (5th Cir.1982).[4]

### Class Claim

■ Hill's class action alleged that in the three Shreveport/Bossier City stores, black females were unfairly treated in hiring, job allocation, promotion, and compensation.[5] The district court found that Hill's statistical and anecdotal evidence failed to establish a class-wide claim of discrimination against black females. We are likewise convinced that no class-wide disparate treatment was established.[6]

---

3. Hill's individual claim of disparate treatment under § 1981 is subject to the same analysis accorded Title VII disparate treatment cases. *Junior v. Texaco, Inc.,* 688 F.2d 377 (5th Cir. 1982); *Pouncy v. Prudential Ins. Co. of America,* 668 F.2d 795 (5th Cir.1982).

4. Hill's claim of unequal compensation is also without merit. The evidence, as the district judge found, "showed very dramatically that she got paid in a nondiscriminatory manner when compared with males who were also assigned to the job of assistant manager." The judge's factual findings regarding compensation are not clearly erroneous. Fed.R.Civ.P. 52(a). No showing was made that Hill's salary and salary increases did not match those of co-workers with her position, seniority, and background.

5. The complaint also charged discriminatory recruitment, an issue not pursued at trial or on appeal. It was rejected by the trial court; we do the same.

6. The district court found that no *prima facie* case had been established, an issue we need not address since the evidence as a whole fails to prove class-wide disparate treatment. *See Pouncy,* 668 F.2d at 798–99 (unnecessary to consider *prima facie* case on individual claims since ultimate burden to show discrimination not met).

We analyze the class claim under a disparate treatment model since impact analysis is not

■ Hill was obliged to prove that K-Mart, acting with discriminatory motive, discriminated against blacks in more than isolated, sporadic, or unusual acts. *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977). The party with the burden of proof is understandably attracted to statistical evidence for it "may be used to show both motive and a pattern or practice of racial discrimination." *Pouncy*, 668 F.2d at 802. "In a proper case, we may infer racial discrimination if gross statistical disparities in the composition of an employer's work force can be shown." *Id.*

In the instant case Hill presented statistical data on compensation through a paralegal who had prepared a chart of average gross wages. The witness was unable to include in her analysis such basic pay factors as hours worked and seniority. She did not test the sampling for statistical significance. In addition, as the court found and Hill concedes, the witness made erroneous calculations.

Hill retained an expert in statistics to analyze K-Mart's records and to prepare a report on the reflected hiring, placement, and promotion practices. At trial, the expert's findings were read into the record at K-Mart's request; Hill's expert found no statistically significant under-utilization of black females at the three stores in question. K-Mart also offered a statistical expert, Dr. Paul Andrisani, who testified that his studies showed no significant statistical disparity between the observed black female work force at the three stores and the expected number. Dr. Andrisani also found no significant under-utilization of black females in supervisory and assistant manager positions.[7] In addition, Dr. Andrisani analyzed the raw findings presented by the plaintiff and found them inadequate for failing to include consideration of seniority, vacation periods, position, or hours worked. We are similarly impressed.

Hill maintains on appeal that the expert's criticisms, without more, should be disregarded, pointing out that although Dr. Andrisani testified that Hill's evidence ignored seniority and prior experience, he could not say that K-Mart's white males were more senior or had more experience. Hill misperceives her evidentiary burden. Hill has the

---

"the appropriate vehicle from which to launch a wide ranging attack on the cumulative effect of a company's employment practices," *id.* at 800, but rather applies where facially neutral practices fall more harshly on certain groups. Where, as here, the complaint challenges discriminatory practices, subjective decisions, and specific placement policies, trial court analysis and appellate review are to examine the case under the requirements of the disparate treatment model.

The court improvidently granted a Fed.R. Civ.P. 41(b) motion on the class claim in the course of presentation of evidence by the defense. *See Wealden Corp. v. Schwey*, 482 F.2d 550 (5th Cir.1973). Hill has argued no prejudice from the court's timing of its consideration of Rule 41(b). She makes no claim that the procedure prevented full development of her case. We review the class claim as if it were a decision on the merits at the close of all evidence rather than under the Rule 41(b) mechanism. *Cf. Rigel Fiber Corp. v. Anderson Gin Co.*, 512 F.2d 784 (5th Cir.1975) (denial of Rule 41(b) motion has same effect as carrying it with case and entering final judgment on merits at close of the evidence); *Schwey*, 482 F.2d at 552 (because defendant waived original motion by presenting evidence, court may consider all evidence); *Weissinger v. United*

*States*, 423 F.2d 795 (5th Cir.1970) (en banc) (denial of motion does not preclude trial judge from weighing evidence and making findings).

7. "Significance" is a critical statistical concept. It gives meaning to bare numbers. Dr. Andrisani tested the significance of each of his findings using a standard deviation of 1.96 or less. Although a standard deviation below the "two or three" benchmark of expected discrimination expressed in *Hazelwood Indep. School Dist. v. United States*, 433 U.S. 299, 97 S.Ct. 2736, 53 L.Ed.2d 768 (1977), is not dispositive proof that no discrimination has occurred, the evidence's statistical significance certainly has probative value in the court's consideration of that evidence and the search for a "gross statistical disparity." The care with which we review the statistics is especially marked in a disparate treatment case, since if the required showing of motive is to be inferred, we must be certain that the inference rests on firmer ground than uninterpreted numbers. Both statistical experts tested their findings for significance and found no real disparity where the numbers varied and no disparity at all where the number of black females exceeded the expected number.

burden to give her raw statistics relevance and meaning by accounting for basic factors likely to affect the evidence's probative value. Hill did not attempt to fill the evidentiary gaps or resolve the questions the bare numbers left begging.[8]

Hill's statistical evidence is not convincing, the raw data are incomplete and insufficient, and the tendered conclusion is not legally or statistically significant. Guided by "a word of caution to those who would enter the courthouse armed with statistics that prove little more than a litigant's resourcefulness at manipulating numbers," *Pouncy,* 668 F.2d at 804–05, we observe that the warning carries even more force where the numbers, after untethered handling, fail to prove discriminatory motive and practice. The record reveals no gross statistical disparities; indeed, it reveals no significant disparities at all.

Hill supplemented her statistical showing at trial by offering testimonial evidence alleging discriminatory acts and decisions. The district court considered this evidence in conjunction with the statistical offering in concluding that no discrimination had been established. This ultimate fact of discriminatory intent is a finding protected by the aegis of Fed.R.Civ.P. 52(a). *Pullman-Standard v. Swint,* 456 U.S. 273, 102 S.Ct. 1781, 72 L.Ed.2d 66 (1982). This finding is not clearly erroneous; indeed, it is quite correct.

The testimony that K-Mart caused or allowed discriminatory treatment of black females is singularly unimpressive. On the hiring charges we find no testimony by or about any unsuccessful job applicant. On the promotions charges the trial court was unable to find "a single instance when a black female was passed over for promotion for a discriminatory reason." Instead, "[t]he record here is replete with examples of promotions actually awarded to black females," too many examples, the court noted, to justify a finding of tokenism. While

subjective criteria and discretionary promotion procedures may present a situation conducive to invidious discrimination, *see Rowe v. General Motors Corp.,* 457 F.2d 348 (5th Cir.1972), the record reveals that in this case no such discrimination resulted.

Hill's evidence has failed to establish a pattern or practice of intentional discrimination against the class in compensation, hiring, placement, or promotion. Nor has she met the burden of establishing her individual claim.

AFFIRMED.

---

8. The comparisons Hill summarizes in her brief suffer from similar inadequacies. No showing of statistical significance is offered. Again we are urged to consider numerical generalities from gross figures without due regard for relevant factors which would give the generalities substance.