Mena J. HARRIS, Plaintiff,

v.

William BOLGER, Postmaster General of the United States Postal Service, Defendant.

No. CV82–5419–AAH(Bx).

United States District Court, C.D. California.

Dec. 26, 1984.

Robert C. Bonner, U.S. Atty., Frederick M. Brosio, Jr., Asst. U.S. Atty., Chief, Civil Division, George H. Wu, Los Angeles, Cal., for defendant.

FINDINGS OF FACT AND
CONCLUSIONS OF LAW;
AND ORDER

HAUK, District Judge.

On November 26 and 27, 1984, trial was held in the above-captioned matter. Plaintiff was represented by Albert Maldonado, Esq. Defendant was represented by George H. Wu, Assistant United States Attorney, and by Nancy Hutt, Attorney with the United States Postal Service. After review of the pleadings, pre-trial materials, and the evidence admitted at trial and after hearing the testimony of the witness at trial and the arguments of counsel, the Court makes the following Findings of Fact and Conclusions of Law:

I

FINDINGS OF FACT

A. *Pre-Trial Conference Order*

The parties have admitted in the Pre-Trial Conference Order signed by this Court that:

(1) Plaintiff, a white female, has brought this suit under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–5(f). She alleges racial discrimination by employees of defendant based on her marriage to a black male, and also alleges sexual harassment.

(2) On January 21, 1980, plaintiff was hired as a probationary employee in the position of a part-time flexible trainee for the multi-purpose letter sorting machine ("MPLSM trainee") at the San Bernardino postal facility. Along with the plaintiff, six other MPLSM trainees began their probationary period on that date. All six were females; three were white, two were black and one was hispanic.

(3) The probationary period was for ninety days. As part-time flexible employees, MPLSM trainees would normally be at the postal facilities between six to eight hours per workday, five or six days per week.

(4) MPLSM trainees receive 1½ hours of training, five workdays per week, on practice MPLS machines located in a separate training room off the main workfloor area. For that 1½ hour period, they are supervised by the Training and Development

Specialist who is responsible for providing training and making sure that the educational operations are running smoothly.

(5) MPLS machines are devices which separate letters into groups according to zip code designations. The operator sits in a console with a keyboard, reading the letter addresses and keying in the code designations. All probationary MPLSM trainees receive eight consecutive lessons in the use of the machines. They are tested at each lesson in the use of the machines. They are tested at each lesson level before being permitted to advance to the next lesson. They are given a total of 47 training hours to pass all eight lessons. At the last lesson, the trainee is required to complete, within a certain time period, two consecutive runs on the machine with a total of ten errors or less. The failure to pass this proficiency test results in the removal of the trainee at the end of the probationary period for failure to qualify on the MPLS machines. The regulations of the Postal Service do not allow for any deviation from or exception to that proficiency requirement.

(6) When not in training on the MPLS machines, MPLSM trainees are assigned to the various work areas in the San Bernardino postal facility to perform whatever duties are required at that time. They receive their assignments from the various mail processing supervisors. Trainees receive two evaluations as to their performance of this work, one after 30 days and another after 60. However, those evaluations are mainly to provide the employee with some feedback; and passing the proficiency test is the principal criterion for continued employment.

(7) At approximately the 60th day into the probationary period, the plaintiff complained to a supervisor that she was being bothered in the training room by another trainee. In turn, two trainees complained that the plaintiff was harassing them during the training period. To alleviate such problems, the schedule was changed so that plaintiff and the other two trainees used the practice MPLS machines at separate times.

(8) Plaintiff also began complaining that the work assignments were not fairly divided among the seven MPLSM trainees. She specifically charged one supervisor (Diane Miller) with nepotism since her sister (Irene Castro) was a trainee along with plaintiff; and plaintiff felt that Ms. Castro received better assignments. In turn, her supervisors complained about plaintiff's willingness to accept assignments.

(9) Plaintiff also complained that her timecards and her personal items (*e.g.*, her purse and keys) were being moved by her fellow employees and she would have to search for them. These types of complaints are commonly made by trainees who are often assigned to different work areas during their shifts and who misplace items in that interim. At no time did plaintiff charge that anything was stolen from her.

(10) In all of these initial complaints, plaintiff did not assert to her supervisors that she was being subjected to either racial discrimination or sexual harassment.

(11) In addressing various complaints about assignments and disputes among trainees, a group meeting was called. At that meeting, a supervisor (Anthony Coppola) discussed with the trainees the issues of their getting along with each other and assignments to the various work areas.

(12) On or about March 12, 1980, plaintiff received written notice from the postal service that her 47 hours of MPLSM training had expired and she had failed to qualify on the machines by passing the proficiency test. The letter stated that she would be terminated at the end of her probationary period on March 26, 1980. However, she was given a two-week grace period to attempt to qualify on the MPLS machines on or before that latter date.

(13) After receipt of the termination letter, plaintiff began to complain more vigor-

ously. For the first time, she told her supervisors that she thought that some of her fellow trainees were treating her differently because of her interracial marriage. At this time, plaintiff did not claim that any supervisor had discriminated against her on the basis of race. The only specific instance of discrimination given by plaintiff was an alleged receipt of racial comments in a phone call to her home at night. She could not identify the caller's voice. Also, plaintiff never at any time told a supervisor that she was being sexually harassed.

(14) On or about March 21, 1980, plaintiff was given a copy of her 60-day evaluation. Said evaluation gave her satisfactory marks in all areas except for unsatisfactory grades in her "attitude towards work, co-workers and supervisors," her "willingness to handle all assignment," and her MPLSM training. Another trainee who had had personality conflicts with plaintiff was also given an unsatisfactory mark in the "attitude towards co-workers" category.

(15) The day before her termination date, plaintiff first sought EEO counseling. At that time, she alleged disparity in her work assignments, an unfair evaluation and improper instruction as a result of racial discrimination. Also for the first time, she charged sexual harassment by a supervisor. However, she did not allege that her training supervisor (Ella Quates) discriminated against her in any way.

(16) By March 26, 1980, plaintiff had not passed the proficiency test on the MPLS machine and she was terminated. As to her six co-trainees, four passed and two failed. Among those who failed was the sister of one of the supervisors who plaintiff now claims discriminated against her.

B. *Further Findings*

(1) Plaintiff's testimony covered three general areas. First, she told of incidents which, of themselves, did not demonstrate any racial discrimination but to which she alleged a racial animus. For example, she claimed to have been assigned more often than other trainees to certain work areas (*i.e.* the speed belt and flats section) which she contended were generally more onerous than the other jobs. She claimed that her timecards, keys, and other personal property turned up missing on many occasions. As to the second area, she testified concerning incidents where derogatory remarks were made to her because she was married to a black man. Third, she claimed that one of her supervisors (Ernest Nunez) sexually harassed her by making certain suggestive gestures towards her on four or five occasions.

(2) Plaintiff produced one witness, Jo Ann Cooper, who generally supported plaintiff's testimony as to the first area. However, Mrs. Cooper provided no testimony which would lead one to conclude that those incidents (*e.g.* the assignments, the lost timecards) were caused by any racial animus. Mrs. Cooper also testified that she had no independent knowledge as to the other two areas (she never overheard any postal employee make a racial remark about the plaintiff nor ever saw plaintiff being sexually harassed).

(3) Plaintiff's second witness, Herbert Belton (a union shop steward), likewise testified that he had no independent knowledge as to plaintiff's being discriminated against on account of her marriage to a black man or to her being sexually harassed. While Mr. Belton did state that the plaintiff did complain to him regarding certain incidents, he stated that he himself did not witness any of those incidents.

(4) Ella Quates, plaintiff's immediate supervisor in the MPLSM training room and a black female, testified that she only received three complaints from plaintiff. Only one of them concerned racial discrimination or sexual harassment. The complaint was that plaintiff was having difficulties with other trainees because of the fact that she was married to a black man. Plaintiff did not tell Mrs. Quates that any

supervisory personnel had discriminated against her or treated her unfairly. Mrs. Quates, herself, never saw any evidence of racial discrimination or sexual harassment of the plaintiff by the other trainees. Mrs. Quates testified that the plaintiff's training record showed that plaintiff was consistently below the norm in her training on the MPLS machines. Further, at the time of her complaint to Mrs. Quates, the record showed that the plaintiff was already unlikely to pass on the proficiency test.

(5) Anthony Coppola, plaintiff's general supervisor on the workroom floor area, only received one complaint from the plaintiff which concerned alleged race discrimination or sexual harassment. Plaintiff reported to him that she received a phone call at home from an unidentified caller who made racist comments to her. Mr. Coppola investigated the matter but discovered no evidence that the call was made by any postal employee. Mr. Coppola testified that he did not discriminate against plaintiff on the basis of her marriage or sexually harass her.

(6) Plaintiff did not make any other complaint to any of her supervisors regarding race discrimination or sexual harassment until toward the end of her training period at a time when her record indicated that she was unlikely to qualify on the MPLS machine.

(7) Plaintiff's other supervisors (Diane Miller, Ernie Nunez and Donna Baltas) testified that they had no knowledge or information of any act or instance where plaintiff was discriminated against because of the fact that she was married to a black man or where she was the victim of sexual harassment. They denied ever having discriminated against the plaintiff.

(8) Plaintiff failed to proffered evidence that her supervisors ever knew of her marriage to a black man until she so informed some of them towards the end of the training period.

(9) The Court finds the testimony of plaintiff's supervisors (Miller, Nunez, Baltas, Coppola and Quates) to be credible.

(10) Irene Castro Wheetley, the sister of one of the plaintiff's supervisors (Diane Miller) and also a co-trainee along with plaintiff, testified that she had experienced many of the incidents of which plaintiff now complains. She lost her timecards and keys, received assignments in the flats and speedbelt sections, was ordered to work during lunchbreaks, was given unsatisfactory marks on her 60 day evaluation, *etc.* Ultimately, like the plaintiff, Mrs. Wheetley's employment was terminated because of her failure on the MPLS machine.

(11) The only person that plaintiff claims sexually harassed her is Ernest Nunez. Plaintiff offered no evidence of such harassment aside from her own testimony. Mr. Nunez testified and denied plaintiff's allegations. Mr. Nunez is a long time employee of the Postal Service who, until now, has never been charged with sexual harassment. Mr. Nunez's denial of plaintiff's sexual harassment charges was credible.

(12) Aside from plaintiff's own testimony, she has not presented any corroborative evidence which demonstrates that she suffered any racial discrimination or sexual harassment.

(13) The Court finds that plaintiff was a probationary employee who failed to pass a mandatory requirement for continued employment in her job classification (*i.e.* proficiency on the MPLS machine).

(14) The defendant has articulated a nondiscriminatory reason for terminating plaintiff as a probationary employee. That reason was not a mere pretext on defendant's part.

(15) Plaintiff's failure to pass that requirement was not due to any atmosphere or environment of racial discrimination or sexual harassment.

(16) Neither defendant nor his agents sexually harassed the plaintiff. They did

not create nor did they condone an environment for sexual harassment.

(17) Neither defendant nor his agents discriminated against the plaintiff on the ground that she was married to a black man.

## II

## CONCLUSIONS OF LAW

■ (1) A plaintiff in a Title VII suit bears the initial burden of production of evidence establishing a *prima facie* case and also the burden of persuading the trier of fact. *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 252–53, 101 S.Ct. 1089, 1093–94, 67 L.Ed.2d 207 (1981). As to the former, the plaintiff has the burden of proving by the preponderance of the evidence a *prima facie* case of discrimination. *Id.*

■ (2) If the plaintiff succeeds in proving the *prima facie* case, the burden shifts to the defendant to articulate some legitimate, non-discriminatory reason for the employee's rejection. Should the defendant carry the burden, the plaintiff then has the opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination. *Id.* at 253, 101 S.Ct. at 1093; *McDonnell Douglas Corporation v. Green*, 411 U.S. 792, 802–804, 93 S.Ct. 1817, 1824–1825, 36 L.Ed.2d 668 (1973).

■ (3) Defendant, to meet its burden of articulating some legitimate non-discriminatory reason for the employee's rejection need not prove an absence of discriminatory motive. *Bd. of Trustees of Keene St. College v. Sweeney*, 439 U.S. 24, 25, 99 S.Ct. 295, 58 L.Ed.2d 216 (1978); *Agarwal v. A.G. McKee & Co.*, 644 F.2d 803, 805 n. 1 (9th Cir.1981). "It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff. To accomplish this, the defendant must clearly set forth, through the introduction of admissible evidence, the reasons for the plaintiff's rejection." *Burdine, supra,* 450 U.S. at 254–55, 101 S.Ct. at 1094–95.

■ (4) A federal agency can terminate the employment of a probationary employee for any reason unless prohibited discrimination is involved. *Casey v. Roudebush*, 395 F.Supp. 60, 62 (D.Md.1975).

■ (5) In the context of discrimination based on sexual or racial harassment in the workplace, the plaintiff must show that the employer created or condoned an environment which significantly and adversely affected an employee because of his race or sex. *See Henson v. Dundee*, 682 F.2d 897, 901 and 905 (11th Cir.1982). Isolated incidents do not result in such an atmosphere. *Hill v. K-Mart Corp.*, 699 F.2d 776, 778 (5th Cir.1983); *Friend v. Leidinger*, 588 F.2d 61, 67 (4th Cir.1978). Individual acts of sexual harassment or racial discrimination by employees of a defendant employer are not actionable under Title VII unless they are in some manner sanctioned by the employer. *Silver v. KCA, Inc.*, 586 F.2d 138, 140–142 (9th Cir. 1978); *Barnes v. Castle*, 561 F.2d 983, 992–93 (D.C.Cir.1977).

■ (6) The plaintiff has failed to establish a *prima facie* case that defendant or his agents subjected her to sexual harassment.

■ (7) Looking at plaintiff's testimony by itself and giving to her the benefit of the doubt, it is arguable that plaintiff has established a *prima facie* case of discrimination as to the termination of her employment.

■ (8) However, the defendant has clearly established valid, legitimate reasons for terminating plaintiff's employment, (*i.e.* her failure to meet the proficiency requirements on the MPLS machine).

■ (9) The Court concludes that plaintiff has failed to show that the defendant's

reasons are a mere pretext or was a fraud to conceal racial bias.

(10) The Court finds for the defendant and against the plaintiff.

## ORDER

It is ordered that judgment be entered in accordance with these Findings of Fact and Conclusions of Law.

## JUDGMENT

The Court on November 27, 1984 orally made Findings of Fact and Conclusions of Law herein and has subsequently entered written Findings of Fact and Conclusions of Law. In accordance with said Findings of Fact and Conclusions of Law and good cause appearing, it is hereby:

ORDERED, ADJUDGED and DE-CREED that judgment shall be entered in favor of defendant and against plaintiff forthwith. Plaintiff shall recover nothing and take nothing from and against defendant.

IT IS ALSO ORDERED that defendant shall not recover from plaintiff costs of suit herein.

IT IS FURTHER ORDERED that the Clerk shall forthwith serve copies of the Findings of Fact, Conclusions of Law, and Judgment herein on the plaintiff and her counsel of record and on defendant and his counsel of record.