United States Court of Appeals
Fifth Circuit

**F I L E D**

**July 13, 2004**

Charles R. Fulbruge III
Clerk

I n the

# United States Court of Appeals
## for the Fifth Circuit

_____

m 03-41497
Summary Calendar

_____

LISA R. REZNICK, DOCTOR,

Plaintiff-Appellant,

VERSUS

ASSOCIATED ORTHOPEDICS & SPORTS MEDICINE, P.A.,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Eastern District of Texas
Nº 4:01-CV-92

_____

Before SMITH, DeMOSS, and STEWART,
Circuit Judges.

JERRY E. SMITH, Circuit Judge:[*]

_____

[*] Pursuant to 5TH CIR. R. 47.5, the court has de-
termined that this opinion should not be published
and is not precedent except under the limited cir-
cumstances set forth in 5TH CIR. R. 47.5.4.

Lisa Reznick sued her former employer,
Associated Orthopedics & Sports Medicine,
P.A. ("AOSM"), alleging violation of the
Equal Pay Act and sex discrimination under
title VII of the Civil Rights Act of 1964.
AOSM filed a motion for summary judgment,
which the district court granted, and this ap-
peal followed. Agreeing with the district court
that Reznick fails to establish a *prima facie*
case for either claim, we affirm.

## I.

In early 1997, Reznick, an orthopedic surgeon specializing in hand, wrist, and elbow care, contacted AOSM about possible employment. AOSM is a medical practice group specializing in orthopedic care and was founded by partners and sports medicine specialists, Drs. Neal Small and Alex Glogau. Interested in adding a hand specialist to their practice group, AOSM accepted Reznick's resume and set up an interview. Although receiving several negative recommendations from previous employers regarding Reznick's productivity and ability to get along with other personnel, AOSM offered her the position of associate physician, and negotiations began between AOSM and Reznick, who had the assistance of counsel.

AOSM initially offered Reznick nearly the same three year employment contract that it had made in June 1996 with Dr. Peter Kwong, an associate doctor and sports medicine specialist whose three-year employment agreement provided for a base pay in year one of $125,000, in year two of $135,000, and in year three of $145,000. The agreement also included a provision for potential bonus compensation based on Kwong's yearly collections. AOSM's first offer to Reznick included identical base pay and slightly more favorable bonus compensation.

Reznick rejected this first offer and made a counteroffer that included several new economic terms and a maternity leave clause. The counteroffer proposed a base pay of $125,000 for the first year, $140,000 in the second, and $160,000 in year three. This counteroffer was accepted, and the parties entered into an agreement in July 1997.

Reznick asserts that only a few short months after she began her employment, Glogau made a crude, sexist comment to her in the presence of two pharmaceutical salesmen during lunch.[2] Afterwards, Reznick confronted Glogau about the statement. Although he brushed her off, telling her she was being too sensitive, he did regret "if he might have offended her." Also that fall, Glogau allegedly asked other employees whether they believed that Reznick is a lesbian. After hearing this information second-hand, Reznick talked to Glogau and assured him she was heterosexual. During this period, Glogau allegedly made several comments to Reznick regarding her office attire, noting that he wished she wore skirts more often.

In the spring of 1998, Kwong resigned from AOSM because, according to Reznick, he was informed that he would not make partner. During that time, AOSM entered into intense negotiations with Dr. Michael Schwartz to join AOSM as an associate doctor. At the time, Schwartz had just completed a one-year fellowship in sports medicine with AOSM, and Glogau and Small regarded him as an excellent doctor. AOSM initially offered Schwartz an employment agreement substantially similar to Reznick's, both having the same initial base salary of $125,000.

Schwartz, however, rejected this initial offer, maintaining that he had other offers with salaries in excess of $200,000. Faced with a partner (Small) who wanted to phase out his sports medicine practice, and desirous of

_____

[2] During the course of the meal, one of the salesmen asked Glogau when the practice would begin advertising for Reznick. Glogau replied that Reznick would receive advertising "when she gets laid."

Schwartz's already proven abilities, AOSM acquiesced and reached an agreement with Schwartz for $175,000 in year one, $185,000 in year two, and $195,000 in year three. The bar required for Schwartz to be eligible for bonuses, however, was set substantially higher than that set for Reznick.[3]

In May 1998, Reznick overheard a telephone conversation among Schwartz, Small, and AOSM's attorney, with Glogau on a speaker phone. According to Reznick, she heard Glogau discussing that she would not be made a partner. Reznick believes her failure to make partner was based on her sex, not job performance.

After Schwartz formally joined the practice in September 1998, Kathy Starnes, AOSM's administrator since September 1997, suggested that AOSM hold an open house to advertise Schwartz's association with the group. Initially skeptical of the suggestion, Glogau only reluctantly agreed to host the party when Starnes was able to assure him that the pharmaceutical groups would foot most of the bill.

Despite the sending of over four hundred invitations, the open house was very poorly attended, and AOSM again returned to its policy of not hosting such events. When Dr. Greg Powell joined the practice in January 2000, AOSM did not host an open house. Reznick alleges, however, that AOSM's failure to host an open house for her and its refusal to include her on the invitation to Schwartz's are the result of her sex.

During 1998, Reznick was assigned Karen Botte, a medical assistant/x-ray technician, to assist her during the two and one-half days she spent at the clinic. After Schwartz started as an associate doctor in September, he was assigned to Marilee Harden, a nurse whom he shared with Small.

Later that year, Reznick began to complain about Botte's competence, so AOSM offered to switch plaintiff to Harden and allow her to share Harden with Small, who worked in the clinic only on Wednesday mornings. Reznick maintains that AOSM's request that she share an assistant while Schwartz had his own is further evidence of AOSM's discriminatory behavior. In January 2000, however, AOSM hired Bobbie Caldwell in response to Reznick's complaints, and Caldwell worked for Reznick exclusively until Reznick's resignation.

In March 2000, Reznick submitted her resignation letter, providing ninety days' notice. Reznick proceeded to fulfill her obligation and worked the ninety days despite AOSM's offer to pay her for the entire period if she wished to leave earlier. Reznick alleges that her resignation was triggered by Glogau's last-minute request that she see one of his patients because he was unavailable. Unable to help the patient and frustrated by Glogau's absence, Reznick determined that she could no longer remain with AOSM.

## II.

Summary judgment is appropriate only where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. *See* FED. R. CIV. P.

---

[3] During her first year alone, Reznick became eligible for a bonus equal to 10% of her collections in excess of $276,000, 12.5% in excess of $400,000, and 15% in excess of $500,000. Schwartz, on the other hand, was only eligible for a bonus equal to 20% of his collections in excess of $450,000.

56(c). In determining whether there is a genuine issue of material fact, evidence and inferences must be drawn in the light most favorable to the non-moving party. *Daniels v. City of Arlington, Tex.*, 246 F.3d 502 (5th Cir. 2001). The party seeking summary judgment carries the burden of demonstrating that there are no actual disputes as to any material fact.

If the nonmovant then fails to set forth specific facts to support its allegations, summary judgment is appropriate. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). The nonmovant must "go beyond the pleadings . . . and designate specific facts showing that there is a genuine issue for trial." *Id.* at 324. Summary judgment is proper even if the nonmovant brings forth evidence in support of his allegations, so long as the evidence is insufficient for a reasonable jury to find for that party as "[t]he mere existence of a scintilla of evidence in support of plaintiff's position" is insufficient. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). We review a summary judgment *de novo*. *Meditrust Fin. Serv. Corp. v. Sterling Chem., Inc.*, 168 F.3d 211, 213 (5th Cir. 1999).

## III.

Reznick makes two independent accusations against her former employer. She maintains that AOSM violated the Equal Pay Act by paying Schwartz a substantially higher salary, despite the fact that he held an identical position and performed similar duties. Additionally, she argues that AOSM's, and specifically Glogau's, sexist behavior and sex-based discrimination resulted in her constructive discharge, thereby violating title VII.

## A.

Under the Equal Pay Act, an employer is prohibited from sex-based discrimination where the jobs performed require equal skill, effort, and responsibility and are performed under similar conditions. 29 U.S.C. § 206-(d)(1). To establish a *prima facie* case, Reznick must offer proof (1) that AOSM is subject to the Equal Pay Act; (2) that she performed work in a position requiring equal skill, effort, and responsibility under similar working conditions; and (3) that she was paid less than a male employee in that position. *Peters v. City of Shreveport*, 818 F.2d 1148, 1153 (1987). If Reznick makes a *prima facie* case, AOSM may still prevail provided it can demonstrate one of the four affirmative defenses specified under the Act.[4]

AOSM contends that Reznick fails to establish element two in her claim. To prove that her position is "substantially equal" to Schwartz's, Reznick must show that her job requirements and performance were substantially equal, though not necessarily identical, to those of a male employee. 29 C.F.R. § 1620.-13(e). Reznick argues that this issue is a question of fact for the jury and that because she and Schwartz were trained orthopedic surgeons, and were required to perform surgery and work in the clinic, Schwartz's job is substantially similar to hers.

Schwartz, however, was trained in the subspeciality of sports medicine, while Reznick was trained as a hand surgeon. AOSM maintains that sports medicine specialists generate more revenue than do hand surgeons and that

---

[4] Disparities in salary are allowed where payment is made pursuant to "(1) a seniority system; (2) a merit system; (3) a system which measures earnings by quantity or quality of production; or (4) a differential based on any other factor other than sex." *Plemer v. Parsons-Bilbane*, 713 F.2d 1127, 1136 (5th Cir. 1983).

Schwartz's higher pay was a reflection of his greater economic value. Evidence provided by AOSM's office manager confirms this.

In 1999, during Schwartz's first full year as an associate, he generated nearly twice the amount of revenue as did Reznick, who does not dispute this fact. Because Reznick and Schwartz specialized in different areas of orthopedic medicine, and Schwartz generated far more revenue for AOSM than did Reznick, the two cannot be said to have held "substantially equal" positions, so element two of Reznick's claim fails as a matter of law.

Let us assume, *arguendo*, that Reznick and Schwartz performed substantially similar jobs, and Reznick can make a *prima facie* case. The disparity between Reznick's and Schwartz's salaries is primarily a result of Schwartz's higher production, and this reason falls under exception three of the Equal Pay Act.[5] The remainder of the differential can be explained by separate and distinct circumstances that led to differences in their employment contracts (which may be said to fall under the "catch all" exception four). Thus, AOSM can make out valid affirmative defenses to the

---

[5] Let us compare Schwartz's salary with Reznick's from approximately September 1998 to September 1999 (roughly Schwartz's first year as an associate and Reznick's second). Based on the data provided by AOSM, Schwartz's salary would have been roughly $265,000, of which nearly $90,000 would have come from bonuses alone. Reznick, comparatively, made approximately $160,000 that year, only $19,000 or so coming from bonuses. Thus, the disparity of over $100,000 in gross yearly income comes almost wholly from a bonus structure that *rewards productivity*. Had Reznick equaled her associate in collections, her salary would have been approximately $253,000 in year two of her contract.

salary disparity between Reznick and Schwartz.

Reznick and Schwartz negotiated independent contracts. In this arms' length transaction, Reznick was assisted by counsel and successfully negotiated her own terms, which put her in a *better* financial position than that of the *male* associate currently working at AOSM. When AOSM accepted her counteroffer, Reznick got exactly what she asked for. Although she maintains that she was expected to stay in line with Kwong's salary, but Schwartz was not bound by hers, her willingness to accept this indicates only the success of AOSM's bargaining power. After all, Reznick could have held out for more, hoping AOSM's desire for a hand surgeon would force it to offer better terms, but instead she was satisfied enough with her counteroffer to accept employment.

Negotiating his own contract a year later, Schwartz was more successful than was Reznick in negotiating favorable terms for a variety of reasons that have nothing to do with his sex. Firstly, as discussed above, Schwartz, a sports medicine physician, could be expected to generate higher revenue. Secondly, he had spent his internship with AOSM, which thus already knew him and was familiar with his work. Reznick, on the other hand, had never worked for AOSM and came with some negative recommendations from her previous employer. Schwartz's potential value to AOSM was therefore less of an unknown variable than was Reznick's.

Thirdly, Schwartz was in greater demand and was able to use outside offers with higher base salaries as leverage against AOSM. Reznick had no other offers to press for higher pay and was not employed at the time. Reznick

argues that these reasons were not the true motivating factors behind AOSM's decision to make Schwartz's pay substantially higher than hers; Reznick, however, offers no evidence to raise a genuine issue of fact regarding the legitimacy of these defenses, all of which are valid exceptions under the Act; therefore, even if she were able to make out a *prima facie* case, she could not prevail.

### B.

A plaintiff alleging sex discrimination under title VII in the absence of direct evidence must make out a *prima facie* case for discrimination. *Molnar v. Ebasco Constructors, Inc.*, 986 F.2d 115, 118 (5th Cir. 1993). Reznick can establish a *prima facie* case if she shows that she (1) was a member of a protected class; (2) was qualified for the position; (3) suffered adverse employment action; and (4) was replaced by someone outside the protected class or that similarly situated individuals outside the protected class were treated more favorably. *Urbano v. Cont'l Airlines, Inc.*, 138 F.3d 204, 206 (5th Cir. 1998).

Under the framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973), once Reznick has established a *prima facie* case, the burden of production is on AOSM to "articulate some legitimate, nondiscriminatory reason" explaining its conduct. If AOSM is able to articulate such a reason, Reznick must make a showing sufficient for a jury to find that the reason was mere pretext and discrimination was the true motivation. *Bodenheimer v. P.P.G. Indus., Inc.*, 5 F.3d 955, 957 (5th Cir. 1994). If Reznick fails to satisfy her burden of proof in the first or third step, her claim fails as a matter of law.

The parties dispute only Reznick's ability to prove element three, that she suffered an adverse employment action, and the district court found for AOSM and granted summary judgment accordingly. This court does not recognize interim measures to be adverse employment actions; rather, we look to ultimate employment decisions such as termination. *Mattern v. Eastman Kodak Co.*, 104 F.3d 702, 708 (5th Cir. 1997). To qualify as an adverse employment action, the decision must effect a material change in the terms or conditions of the employment. *Eugene v. Rumsfeld*, 168 F. Supp. 2d 655, 671 (S.D. Tex. 2001).

In light of these considerations, ReznickSSbecause she was not firedSSmust show that she was constructively discharged. To prove her claim, she must demonstrate that working conditions were "so intolerable that a reasonable person would feel compelled to resign." *Faruki v. Parson S.I.P., Inc.*, 123 F.3d 315, 319 (5th Cir. 1997). The following factors must be considered: (1) demotion; (2) reduction in salary; (3) reduction in job responsibilities; (4) reassignment to menial or degrading work; (5) reassignment to work under a younger supervisor; (6) badgering, harassment, or humiliation by the employer calculated to encourage the employee's resignation; and (7) offers of early retirement on terms that would make the employee worse off. *Barrow v. New Orleans SS. Ass'n*, 10 F.3d 292, 297 (5th Cir. 1994).

Reznick offers the following nineteen facts to support her claim of constructive discharge:

(1) Glogau's humiliating public statement conditioning advertising for Reznick upon her "getting laid."

(2) Glogau's questioning Reznick's sexual orientation.

(3) Glogau's statements questioning Rez-

nick's selection of apparel;

(4) AOSM's unwillingness to advertise for Reznick;

(5) AOSM's hosting an open house for Schwartz when it did not host one for Reznick;

(6) Glogau's refusal to include Reznick on Schwartz's open house invitation;

(7) AOSM's failure to provide Reznick with a solely assigned assistant;

(8) AOSM's hiring a PA for Schwartz six months into his position;

(9) AOSM's citing Kwong's contract as a reason for its inability to offer more compensation to Reznick, but not telling Schwartz that his salary must take Reznick's compensation into consideration;

(10) AOSM's decision to pay Schwartz significantly more than it paid Reznick;

(11) Starnes's inactions as AOSM's Equal Pay Act compliance officer;

(12) AOSM's decision that Reznick would not be considered for partner;

(13) AOSM's financial arrangement whereby Small referred patients to Schwartz and not to Reznick;

(14) Small's and Glogau's refusal to refer hand cases to Reznick;

(15) Small's weekly physician basketball games to which Reznick was not invited;

(16) Glogau's significant social interaction with Schwartz as compared to Reznick;

(17) Glogau's refusal to meet with Reznick unless someone else was present;

(18) Glogau's inclusion of Schwartz as an associate in business decisions; and

(19) Glogau's sharing of professional opportunities with Schwartz but not with Reznick.

Reznick did not experience a demotion[6] or reduction in salary or job responsibilities. Furthermore, she was not assigned to either degrading work or a younger supervisor, and early retirement was not an issue. Therefore, the only factor relevant to Reznick's claim of constructive discharge is (6), "badgering, harassment or humiliation by the employer calculated to encourage the employee's resignation." *Barrow*, 10 F.3d at 297.

The nineteen facts offered by Reznick, even when construed in a light most favorable to her, do not support the finding that she was

---

[6] Reznick argues that failure to be made partner constituted a *de facto* demotion. Firstly, by definition a demotion cannot be considered a failure to be promoted. Reznick remained in the same position to which she was hired for her entire tenure at AOSM. Additionally, Reznick was never promised that making partner was a guarantee should she become an associate.

Furthermore, Kwong, a male physician, was also not selected to become a partner, indicating that Reznick was not excluded from the partnership based on sex alone. A reading of the employment contract suggests that joining the partnership was left wholly up to the discretion of the existing partners and was in no way automatic.

badgered, harassed, or humiliated into quitting. Above all, she is unable to establish a causative link between AOSM's allegedly discriminatory actions and her resignation. Facts one through thirteen all occurred two to three years before Reznick's resignation, and constructive discharge cannot be based on facts that are remote in time. *See Hill v. K-Mart Corp.*, 699 F.2d 776, 779 (5th Cir. 1983). Events that occurred several years before resignation cannot be said to have been "so intolerable" as to force a reasonable person to leave. *See Faruki* at 319.

The rest of Reznick's allegations deal more with favorable treatment of Schwartz than with treatment of her, and this disparate treatment alone cannot constitute constructive discharge. *See Brown v. Kinney Shoe Corp.*, 237 F.3d 556, 566 (5th Cir 2001). Preferential treatment of Schwartz alone, without other events occurring during the period leading up to Reznick's resignation, do not create a fact issue that she was subjected to an intolerable work environment that compelled her to resign. Because she is unable to establish a *prima facie* case, and thereby satisfy her initial burden of production under *McDonnell Douglas*, we need not explore the question whether AOSM has an adequate defense to Reznick's allegations, nor the question whether she can demonstrate that AOSM's reasons are mere pretext.

AFFIRMED.