**UNITED STATES of America, Plaintiff,**

v.

**Frederick B. AYER, Rita K. Ayer, Empire of America Federal Savings Bank, Ritz Associates, Inc., FBA Inc., Rowland George, Donald Whitney and Universal Aircraft Corp., Defendants.**

No. 85 Civ. 7728 (RO).

United States District Court, S.D. New York.

July 5, 1988.

As Amended July 12, 1988.

Rudolph W. Giuliani, U.S. Atty. S.D.N.Y., New York City, for plaintiff; Jordan Stanzler, Asst. U.S. Atty., of counsel.

Joseph Kazarnovsky, c/o Morton Ginsberg, New York City, for Frederick B. Ayer, Sr.

Morgan, Lewis & Bockius, Miami, Fla., for Frederick Ayer, II; Daniel Lampert, of counsel.

## OPINION AND ORDER

OWEN, District Judge.

After many years of pursuit, on January 21, 1987, the United States obtained a judgment against Frederick Ayer, an aircraft entrepreneur, in the sum of $929,903.54 for unpaid federal income taxes for the years 1966–71,[1] which it was unable to collect. Thereafter, having reason to believe, correctly as it turns out, that Ayer was continuing in some measure to maintain his executive level of living in his New York–Sarasota–Nantucket style (see Ayer's memorandum p. 132 infra) and was secreting his assets through the use of "alter ego" corporations to transfer assets on his behalf, such as Universal Aircraft Corp. and Aerospace Trading Corporation, Panamanian corporations which were in reality nothing more than personal checking accounts of Frederick Ayer,[2] the government made an application for an Order to Show Cause, which I granted, dated March 17, 1987. It states in part:

> Defendant Frederick B. Ayer, his agents, servants and employees, and all those acting in concert with him, including but not limited to employees and shareholders of Universal Aircraft Corporation, Aerospace Trading Corporation, FBA Aircraft SA and FBA Inc. are temporarily enjoined from transferring any sum of money or thing of value for the benefit of Frederick B. Ayer ... or any spouse or former spouse of Frederick B. Ayer.

Thereafter, I held a hearing on March 29, 1987, after which I signed an Order dated April 7, 1987, which states in part:

> Defendant Frederick B. Ayer, his agents, servants and employees, and all those acting in concert with him, including but not limited to employees and shareholders of Universal Aircraft Corporation, Aerospace Trading Corporation, FBA Aircraft SA and FBA Inc. are preliminarily enjoined from transferring any sum of money or thing of value for the benefit of Frederick B. Ayer, Donna Ellwanger, and children of Frederick B. Ayer; and are preliminarily enjoined from transferring any sum of money or thing of value in payment of the obligations of Frederick B. Ayer; except that Frederick B. Ayer shall be permitted to expend funds for daily living expenses, for which he shall account to the United States Attorney for the Southern District of New York.

Notwithstanding the clear language of this order, I find that Ayer proceeded to circumvent the order by arranging for oth-

---

1. Ayer's principal corporation, FBA, Inc., was the subject of a jeopardy assessment for $2.5 million on April 8, 1988 and a receiver was thereafter appointed to recover fraudulent transfers.

2. Ayer testified, "I was using Aerospace Trading as a personal checkbook. Since I had some $13 million of outstanding judgments against me, I did not have a personal checkbook as such."

ers, and specifically his son Frederick Ayer II and a Panamanian corporation called Panama Aerospace, to pay his debts using money from his corporations.

On August 13, 1987, the government moved to adjudge Frederick Ayer in contempt. In support thereof are two letters and a memorandum showing that Ayer intended to violate the orders in question.

The first letter, dated April 27, 1987, written by Ayer to Eleanor Ayer, his former wife, describes a scheme to make payments to her through Panamanian corporations:

> From now on, for probably some time, you will be receiving all of my monthly checks from various exotic sources. Don't give it a second thought, but the IRS is temporarily hassling me and wishing to see to it that I have no loose funds for other than legal obligations. So, you will be getting checks from my friends in Panama and/or others. Just sit back and enjoy them. You will recall, you have been getting checks from Panamanian corporations anyway that I had at least something to do with. Now they are coming from Panamanian companies I have nothing to do with.

The second letter on June 15, 1987 by Ayer to a creditor in Sarasota, J.W. Harvey & Son, Inc. reads as follows:

> I very much regret the delay in paying your invoice, but as I mentioned to Jim the IRS is once again causing trouble . . .
>
> I am . . . enclosing a copy of a restraining order whereby it becomes unlawful for another to loan me any money for anything other than my personal living expenses.
>
> I had mentioned to June that I am making arrangements to have some of my overseas friends pay various bills, such as yours, that are past due, and I expect that you will receive the payment shortly.

Significantly, Ayer wrote a memorandum on January 1, 1985, which reads in part as follows: [3]

> At the level an audit begins, IRS stated they do not have the authority to follow such logic, and hence have to repeat the entire scene. This resulted in the IRS issuing a deficiency against the business for $11,224,874, and against Frederick and Rita Ayer for $17,017,925 for the years 1972 through 1976.
>
> The fact that the IRS has yet to collect anything from the business they helped to ruin for the years 1964 through 1971 is irrelevant according to the IRS.
>
> Therefore, to "preserve" themselves, Frederick and Rita Ayer have to date found no other alternative but to go under ground, and hence now own nothing that is not pledged to friendly creditors, and intend to continue living in this fashion indefinitely.
>
> The group of FBA companies, owned primarily by Frederick B. Ayer, existing in the 1964 through 1971 years, for all practical purposes are now dormant, with no employees or bank accounts. All subsequent FBA companies are owned by key employees, children or grandchildren of FBA.

On September 4, 1987, I conducted a hearing on a contempt motion and found that Ayer was "in contempt of the court order." In order to determine the nature and scope of payments that Ayer had arranged through others, I ordered Ayer to account for all payments made on his behalf since the date of the court's order of April 7, 1987. Ayer did provide an accounting of payments made by Frederick Ayer II and Panama Aerospace on his behalf since April 10, 1987. Even this accounting shows that Ayer had others pay close to $70,000 of his obligations for matters large and small:

| Person | Relationship | From Panama Aerospace [4] | From Frederick Ayer II | Total |
|---|---|---|---|---|
| Eleanor Ayer | First Wife | $ 350.00 | $ 1,050.00 | $ 1,400.00 |

**3.** Ayer does not dispute the authenticity of these letters or the memorandum.

**4.** Owned by Adolfo de Obarrio Diaz to whom Ayer steered a $30,000 cash "profit" for no work, see fn. 5, infra.

| Person | Relationship | From Panama Aerospace [4] | From Frederick Ayer II | Total |
|---|---|---|---|---|
| Jane Devereaux | Friend | 1,250.00 | 3,750.00 | 5,000.00 |
| Ritz Associates | Maintenance Charges on Rita Ayer's Co–op Apt. at 57th and Park Ave. | 2,971.15 | | 2,971.15 |
| Rita Ayer | Second Wife | 1,625.00 | 10,209.06 | 11,834.06 |
| Donna Ellwanger | "girlfriend"— Mother of Ayer's son, Edward Farley Ayer | 3,208.32 | 18,881.71 | 22,090.06 |
| Rosalyn Gibbs | Friend | 1,300.00 | 3,950.00 | 5,250.00 |
| Presidential | Holds mortgage on house in Sarasota, Florida where Ellwanger and Frederick Ayer reside | | 3,191.68 | 3,191.68 |
| TOTAL | | $10,704.47 | $41,032.48 | $51,736.95 |

In addition to these payments listed above, Frederick B. Ayer II paid an additional $15,250.80 on behalf of his father for miscellaneous items such as travel, reading materials, entertainment, Harvard Club expenses and the grounds keeper of Ayer's Sarasota, Florida residence where he lives with his present companion. These payments constituted willful, intentional violations of the April 7 Court Order. Ayer subsequently testified that he found the Court Order of April 7, "to be an incredibly unfair biased restrictive court order. It might be legal but certainly it is not morally ethical as far as I am concerned." He discussed the order with his son and a Panamanian named de Obarrio, who alleg-edly "volunteered" to pay Ayer's obligations [5] by wiring money into Frederick B. Ayer II's bank account to effect the payments.

Frederick B. Ayer's son, Frederick II, was present in court for the March 27, 1987 hearing. He discussed the temporary restraining order (the Order to Show Cause) and the subsequent April 7 order with his father. The solution they came up with, Frederick II testified in a deposition, was for Frederick II to take loans from FBA, Inc. and Universal Aircraft (his father's "checking account", see supra) in the sum of $40,000 to $50,000 to pay his father's debts.[6] Frederick Ayer II claimed that he

5. Ayer told Obarrio what obligations were to be paid. I note that in 1986, Obarrio entered into a highly questionable transaction for the purchase and immediate resale of airplanes. Ayer handled the entire transaction, yet Obarrio got a $30,000 "profit" in cash for the in-and-out transaction.

6. Frederick II's deposition reads as follows:
Q. Now, in 1987 did you attend court hearings in New York in this case?
A. I attended one, the one that followed—I think it was March 27th. I believe it was ten days after the issuance of the temporary restraining order.
Q. And after that time did you make payments to your father or on behalf of your father?
A. On behalf of my father, yes.
Q. And what type of payments did you make?
A. A wide variety of obligations that he felt he had.
Q. And did you discuss this with your father?
A. Yes.

\*   \*   \*   \*   \*   \*
Q. And where did you get the money to pay these obligations?
A. It would—It kind of depends on the instance. Primarily from loans. In some instances, out of my own pocket from income from Continental Shelf Associates. In other instances, loans from Universal Aircraft. In other instances, loans from FBA, Inc.

\*   \*   \*   \*   \*   \*
Q. And do you remember the amounts involved?
A. The FBA, Inc., loans, I think are currently around $40 to $50,000. Universal is a little more, but I'd have to check. I'm not sure.
Q. And the $40 to $50,000 that you took out of Universal, you used that money to pay—
A. That I took out of Inc.
Q. Excuse me. That you took out of Inc. You used that money to pay the various debts of your father; is that correct?
MR. LAMPERT: He testified that they were obligations to support his family. Why are you trying to make it debts?

was not making these payments in his capacity as an officer of these corporations, for he knew that they could not pay Ayer's debts directly under the April 7 Court Order, nor could he do so as a shareholder and officer thereof. The subterfuge therefore used was to have FBA, Inc. and Universal loan the money to him so that he would appear to be personally paying the debts. This he claimed was done with counsel's "sanction." [7]

Frederick Ayer II also claimed to be acting out of humanitarian concerns, but could not explain what the following bills (which he paid) were for:

| Valerie Wilson Travel | $ 518.00 |
| Worldwide Holidays | 259.00 |
| Jean Brandenburg | 60.00 |
| Visa Card | 1,447.00 |
| Howard Nash | 300.00 |
| Cesar Kudja | 1,048.48 |

■ Accordingly, I find that there is clear and convincing proof of Ayer Sr.'s and Ayer II's deliberate violation of the April 7, 1987 order, the father acting directly and the son "in concert with" him. *See N.A. Sales Co., Inc. v. Chapman Industries Corp.*, 736 F.2d 854, 857 (2d Cir.1984). Ayer II's opposition founders on his own prior testimony, and Ayer Sr.'s affidavit in opposition to the motion for contempt makes no attempt whatsoever to explain these personal expenditures.

■ The Ayers have arrogantly flouted their obligations to their creditors and the IRS as well as orders of the Court for far too long. I therefore hold Frederick Ayer, Sr. and Frederick Ayer II in civil contempt under 18 U.S.C. § 401 based on their disdainful and deliberate violations of the April 7, 1987 order. Given the extensive history of transfers and loans from one corporate entity to another to defeat payment of obligations, I conclude that a monetary sanction would be ineffective in bringing about their future compliance

with this Court order. Accordingly, to compel such future compliance, Frederick Ayer, Sr. and Frederick Ayer II are ordered to commence serving a term of civil confinement of 15 days each in the Metropolitan Correctional Center, New York, New York, under 18 U.S.C. § 401, said term to begin on July 15, 1988 at 10 a.m. *See Perfect Fit Industries, Inc. v. Acme Quilting Co., Inc.*, 673 F.2d 53, 56 (2d Cir.) (civil contempt sanction may serve purpose of coercing contemnor into future compliance with court order, and district court has broad discretion in designing remedy to bring about compliance, taking into account likelihood of effectiveness of particular sanction, harm resulting from continued noncompliance, and burden on contemnor), *cert. denied*, 459 U.S. 832, 103 S.Ct. 73, 74 L.Ed.2d 71 (1982).

So ordered.

---

THE WITNESS: They are not debts on the part of my father. They are things that, under the temporary restraining order, would go unpaid. And I, as Frederick B. Ayer, II, did not wish to see them continue unpaid.

Frederick II's affidavit submitted in opposition to the imposition of a contempt sanction attempts to alter this damaging deposition testimony to assert a different source of borrowing to pay his father's obligations. The Court rejects this belated attempt. *See Isley v. Motown Records Corp.*, 69 F.R.D. 12, 17 (S.D.N.Y.1975).

7. Ayer II testified: "And counsel has advised me that, yes, that case could well be argued."