**Ronald ISLEY et al., Plaintiffs,**

v.

**MOTOWN RECORD CORPORATION and Jobete Music Co., Inc., Defendants,**

**Buddah Records, Inc., et al., Additional Defendants on Counterclaims.**

**No. 69 Civ. 2556.**

United States District Court, S. D. New York.

Nov. 18, 1975.

Sanford M. Katz, New York City, for plaintiffs and additional defendants T–Neck Records and Triple Three Music.

Kaye, Scholer, Fierman, Hays & Handler, New York City, for defendants Motown Record Corp. and Jobete Music.

Emil, Kobrin, Klein & Garbus, New York City, for additional defendant, Buddah Records.

OPINION AND ORDER

OWEN, District Judge.

Plaintiffs, three brothers, are "pop" singers and recording artists. A jury found facts in their favor establishing their right to the income from a "hit" song they recorded with instruments and voices called "It's Your Thing". This favorable verdict was based solely upon their own testimony in the course of which they repudiated their own earlier sworn testimony which clearly supported a contrary conclusion, characterizing such earlier conflicting testimony variously as a lie and false.[1] Given this basis for the verdict, and there being persuasive documentary and testimonial evidence to the contrary, the plaintiffs' favorable verdict cannot stand. It is set aside and a new trial is ordered.

In the mercurial field of popular music, the plaintiffs, brothers Ronald, Rudolph and O'Kelly Isley, singers and recording artists under the name Isley Brothers, had had their ups and downs. In 1968 they had been under contract to defendant Motown Record Corporation for several years and were not doing well. Under that contract from time-to-time they would record new songs, sometimes composed by themselves, sometimes by others. The tapes of those recording sessions were then delivered to Motown to press into records and distribute and the Isleys were paid royalties thereon.[2] In December 1968, the Isleys applied for and obtained a release from the Motown contract. Thereafter, using two wholly-owned companies, Triple Three for the sheet music and T–Neck for the records,[3] the Isleys published and pressed records of "It's

---

1. The three brothers also squarely contradicted each other on the trial as to certain material matters in which the three of them participated.

2. Under the arrangement, Jobete Music Co., Inc., wholly owned by Motown, was the owner of the copyrights to any compositions and Motown was the owner of the master recordings.

3. Both Jobete and T–Neck filed copyright applications for "It's Your Thing".

Your Thing" [4] using defendant Buddah Records, an independent firm, merely as a distributor. There is no question that the Isleys' income was greatly enhanced by marketing "It's Your Thing" under their own label rather than on the Motown label, for "It's Your Thing" was a hit and sold 1,750,000 copies.

The basic issue on the trial was the date on which "It's Your Thing" was first recorded.

Motown offered substantial documentary and testimonial proof to the effect that "It's Your Thing" was first recorded at the A & R Studios in New York on November 6, 1968 at a session for which Motown had advanced the money on condition the Isleys record original tunes; that at that time the Isleys were under contract to it, and that it was therefore entitled to the income from "It's Your Thing" less the Isleys' royalties. The Isleys, to the contrary, testified that "It's Your Thing" was composed in late December 1968, shortly after they got the release from their Motown contract, was first recorded on January 3, 1969, and that Motown had no rights in it at all.

The jury answered three written questions as follows:

1. Have Motown and Jobete proved by a preponderance of the evidence that O'Kelly Isley on behalf of the Isley Brothers agreed on or about November 1, 1968 with Ralph Seltzer of Motown to obtain and furnish him with songwriter agreements on the forthcoming recording session as part of Seltzer's agreement to advance the money for the session?

"No"

2. Do you find that Motown and Jobete had proved by a preponderance[5] of the evidence that "It's Your Thing" and "Turn On, Tune In, Drop Out" were recorded on November 6, 1968 at the A & R Studios in New York?

"No"

3. Do you find that the Isleys have proved by a preponderance[6] of the evidence that "It's Your Thing" and "Turn On, Tune In, Drop Out" were recorded for the first time on January 3, 1969 at the Town Sound Studios in Englewood, New Jersey?

"Yes"[7]

The infirmity in the Isleys' collective testimony, which was the sole support for the jury's several conclusions, is clearly demonstrated by a comparison of their 1969–70 testimony in depositions or before Judge Lasker[8] with their 1975 testimony given on the trial.

The 1969–70 testimony was to the effect that after actually having auditioned another band, they engaged a band called the Midnight Movers as a second choice to do a couple of "ideas" they (the Isleys) had; that they thereafter wrote Motown on November 1 that they were going to do a session with the

---

4. Three Isley songs were involved in this action, but on the trial the proof centered around "It's Your Thing", the only one with which this opinion concerns itself.

5. The Isleys commenced the action seeking a declaratory judgment in their favor alleging the January 1969 recording date. Motown and Jobete counterclaimed asserting that they owned all rights in "It's Your Thing" alleging the November 1968 recording date and demanded an accounting. Without objection by either party, the jury was charged that each side bore the burden of proof as to those facts which supported the right of that side to prevail.

6. See n. 5, *supra*.

7. There is no question that "It's Your Thing" was in fact recorded on January 3, 1969. The jury so found on sufficient independent evidence. However, the fact that it was recorded on January 3, 1969, is in no way inconsistent with the fact that the Isleys had also recorded it earlier, and merely rerecorded it after getting the release from their Motown contract.

8. This was on a motion for a preliminary injunction.

Midnight Movers and asked for money for the session and agreed to deliver the tape after the session; that they received from Motown songwriters agreements to be executed for original tunes; that in preparation for the recording session they had a 3–4 hour rehearsal on the night of November 5; that Ronald and O'Kelly Isley composed the music the Midnight Movers rehearsed; that O'Kelly Isley arranged for the recording studio for November 6, and told A & R how to set it up;[9] that the Midnight Movers were paid $850 for the recording session; that although the Isleys were supposed to send the tape of the session to Motown, they did not, and the tape was still [as of 1969–70] somewhere at O'Kelly's home.

Thus, in 1969–70, while the Isleys maintained that they had not recorded "It's Your Thing" at the November 6 session, they clearly acknowledged that on that date they had made the various customary arrangements for a substantial recording session of *music of their own,* and absent the production of the tape, a trier of the fact could well conclude, given other evidence, that what they recorded was in fact "It's Your Thing".

However, on the trial in 1975 they presented a new story as follows: In the fall of 1968, they were broke and needed money for household expenses and Christmas presents; in order to get Motown to advance them some money, they decided to make up a story about doing a session;[10] they told Motown of this stratagem to which Motown agreed, and wrote the November 1 letter to Motown about the "session" at Motown's suggestion so that there would be a basis for sending the money;[11] that the name of the Midnight Movers was inserted in the letter just to have the name of a band, not having any real awareness of whether that band was available or not;[12] that they had but a 45–60 minutes rehearsal;[13] that they did no "ideas" of the Isleys,[14] and no music composed by the Isleys was performed at either the rehearsal or the session at A & R the next night and in fact there was no vocal music at all;[15] that the Midnight Movers were only paid $400 or $450 and the Isleys, pursuant to plan, pocketed the balance of the $850 they got from Motown for the band;[16] and finally, that the tape from the session was thrown out by the Isleys' mother in cleaning O'Kelly's basement in December 1968, the month following the session.[17]

9. A recording studio is set up in advance with microphones in different locations as desired. From the log of the person at A & R who took the call to book the studio, it was to be set up for group and solo vocal microphones.

10. The earlier testimony that they asked Motown for $1,000 for a session, O'Kelly admitted was not truthful "in the context".

11. Ronald and Rudolph said this was what happened and that all three agreed, but O'Kelly, the one who made the call to Motown, contradicted them both and denied it.

12. The earlier inconsistent testimony that they had already engaged the Midnight Movers was claimed to be an "error".

13. The earlier testimony that the rehearsal lasted 3–4 hours was "reconciled" by O'Kelly saying that the rehearsal was at his house and while the rehearsal itself was only 45–60 minutes, they may have stayed 3–4 hours.

14. The earlier testimony that the Midnight Movers were going to do a couple of ideas of the *Isleys,* became, on the trial, "When I say some ideas, it could be some music that they [*the Midnight Movers*] had."

15. The earlier testimony that the Midnight Movers had rehearsed and recorded music composed by Ronald and O'Kelly was wholly repudiated as "not the truth" or "false".

16. As to the earlier testimony that they paid the Midnight Movers the whole $850, O'Kelly, on the trial, said he had been "lying".

17. The tape, which would have completely resolved the question of what actually had been recorded on November 6, 1968 was, according to the Isleys' testimony in June 1969, in existence at that time. Given the crucial nature of that tape, it is incredible that a) even at that time none of the brothers had checked with their mother to "learn", as they testified on the trial in 1975 that she had thrown it out months earlier, and b) that

Motown's proof consisted first of contemporaneous writings of both parties which were strong circumstantial if not direct evidence that the Isleys intended to and did record new vocal music in the November 6 session. These writings included 1) the Isleys' letter of November 1, written five days before the session, 2) the records of the A & R Studios for the studio on November 6, showing two things, first that the studio had been set up for a solo vocal with a group vocal to be "overdubbed", (see n. 21 *infra*) and second, that during the recording session itself, a change was made as to which microphone was assigned to the "vocal";[18] 3) the Motown letter sent prior to the session after discussion with the Isleys enclosing songwriters agreements to be executed for the original tunes to be recorded,[19] and 4) the letters exchanged a few weeks later when the Isleys demanded releases, at which time Motown wrote insisting on repayment of the entire cost of the session since the Isleys had sent no tapes,[20] to which the Isleys agreed, and repayment was made.

Motown's second area of proof was the testimony of one of the Midnight Movers, George Chillious, a trombone player who played at the November 6, 1968 but not at the January 3, 1969 session. He testified that he played the music for "It's Your Thing" in the November 6 session from a written trombone part bearing the title "It's Your Thing", and after the end of the instrumental session heard Ronald Isley record the vocal part.[21]

■ While I would not on this record, permit this verdict to stand in any event, this is an especially appropriate case for the granting of a new trial since much direct proof is available on a new trial that was not heretofore presented. Frequently, in directing a new trial, a court is faced with the fact that a second jury can do no more than reappraise the same evidence heard on the first trial. Here, however, there are perhaps as many as ten other "Midnight Movers" available who could give testimony as to what was recorded on November 6, 1968, as could the sound engineer of the A & R Studio that night.

On such disinterested testimony, a second jury could obviously *better* determine the issues.

■ The law is well established that it is the duty of the trial judge to set aside a verdict and grant a new trial if, in his opinion, the verdict is based upon evidence which is false or the verdict results in a miscarriage of justice. The trial court is empowered to do this even though there may be substantial evidence which would prevent the direction of a verdict. *Aetna Cas. & Surety Co. v. Yeatts*, 122 F.2d 350 (4th Cir. 1941); *Reyes v. Grace Line, Inc.*, 334

the mother of successful recording artists would throw out *any* tape, let alone one a month old. Finally, the provocative question persists, why had the Isleys not sent the tape immediately to Motown as they had agreed in their November 1 letter?

18. This appears from a chart used by the sound engineer during the session. It tells him which knobs control the various microphones, and what voice or instrument is on each mike, so that he may control the "mix" of the input. After various erasures regarding "vocal solo" and "vocal group", microphone #5 remained assigned to "vocal".

19. There would have been no purpose in sending these songwriters agreements from Motown to the Isleys if from the outset both

Motown and the Isleys knew that nothing new was to be recorded and the session was to be a "sham" to put money in the Isleys' pockets as the Isleys testified in their 1975 version, see *supra*.

20. An adverse inference is also compelled by the fact that the Isleys never sent Motown the tape, thus depriving Motown and the jury of the opportunity to know what was in fact recorded on that session.

21. On a multi-track tape, singers can "overdub", that is, the instrumentalists can record on certain tracks and at a later time a singer can listen to those tracks with earphones during a playback and simultaneously record his own voice on an "empty" track to make a completed work.

F.Supp. 1104 (S.D.N.Y.1971). In my judgment, this verdict, on this record, results in a miscarriage of justice and was in part, if not in whole, based upon evidence which was false. I deem it fundamental that a party may not do a testimonial about-face, concede prior testimony to be false or a lie and then prevail solely upon the basis of that altered self-serving testimony.

For the foregoing reasons and pursuant to Rule 59 Fed.R.Civ.P., the conclusions of the jury as to all issues raised by the three questions submitted to it[22] are set aside and a new trial is ordered. The action is placed on the calendar for trial on January 19, 1976.

---

22. The jury's conclusion as to question #2 has been the focus of this opinion. The jury's conclusion as to question #1, *supra*, suffers from the same infirmity in that it is supported solely by the Isley's testimony. The infirmity in the jury's conclusion as to question #3 which requires setting it aside as well, is that the question speaks of the *"first"* time "It's Your Thing" was recorded. As pointed out in fn. 7, *supra*, the fact that "It's Your Thing" was recorded on January 3, 1969, does not in any way preclude it having been earlier recorded on November 6, 1968. This issue must therefore also be tried anew.