**Irma RIVERA, Plaintiff,**

v.

**BACCARAT, INC., Defendant.**

**No. 95CIV.9478 (MBM)(JCP).**

United States District Court,
S.D. New York.

June 18, 1998.

Joseph C. Maya, Maya & Associates, P.C., Westport, CT, for plaintiff.

Jeffrey H. Daichman, Judith A. Stoll, Kane Kessler, PC, New York, NY, for defendant.

## MEMORANDUM AND ORDER

FRANCIS, United States Magistrate Judge.

Where an attorney's misconduct at trial does not affect the fundamental fairness of the proceedings, the verdict must stand. Where the jury's findings are based on its determination of credibility, the court cannot overturn the verdict, however much it disagrees with the jury's assessment of the witnesses. Both of these principles are central to the determination of posttrial motions in this case.

The plaintiff, Irma Rivera, alleged that she was terminated by her employer, Baccarat, Inc. ("Baccarat"), because of her age and

national origin in violation of the Age Discrimination in Employment Act (the "ADEA"), 29 U.S.C. § 621 *et seq.*, and Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.* Following a week-long trial, the jury absolved Baccarat of the age discrimination charge but found it liable under Title VII on the claim of national origin discrimination. It awarded Ms. Rivera $125,000 in compensatory damages for emotional distress and $375,000 in punitive damages. The parties agreed to reserve the issue of any award of back pay for subsequent determination by the Court.

Baccarat has now moved pursuant to Rule 50(a) of the Federal Rules of Civil Procedure for judgment as a matter of law, contending that the record is devoid of evidence that would support a finding of discrimination on the basis of national origin. In the alternative, Baccarat moves for a new trial under Rule 59(a) on the grounds that the verdict was against the weight of the credible evidence and resulted from the introduction of inadmissible and prejudicial evidence by the plaintiff. The defendant also argues that the damages awarded by the jury are excessive.

*Background*

The summary of the evidence that follows is not intended to be comprehensive. Because the jury found that Ms. Rivera was not discriminated against on the basis of her age, I will omit reference to most of the evidence related to that issue. In other instances, I will defer detailed discussion of the facts until they are relevant to the legal analysis.

Irma Rivera is an Hispanic woman who was born in Puerto Rico. (Tr. 223).[1] In September 1984, she began working for Baccarat, a distributor of fine crystal, as a sales representative in its retail store in Manhattan. (Tr. 224, 233). In 1992, J.D. Watts became the store manager and Ms. Rivera's direct supervisor. (Tr. 238, 249). He testified that the plaintiff was a good salesperson and had the best sales performance of all employees in 1994. (Tr. 197, 201). Following Ms. Rivera's discharge, as well as his own termination from Baccarat, Mr. Watts wrote

---

1. "Tr." refers to the trial transcript.

her a letter of recommendation in which he stated:

> I have known Irma Rivera for almost three years at the Baccarat retail store. She is dedicated, knowledgeable, and hard-working. She has been the top salesperson during my three-year tenure at Baccarat. She sold in excess of $1.2 million in net retail sales in 1994. She is fluent in Spanish and is extremely effective when dealing with South American and other Spanish-speaking customers.
>
> Irma is reliable and honest. She is a team player and supports management and her co-workers. Her aggressiveness and competitiveness make her one of the best sales people I have encountered in my fifteen years in quality tabletop and gift retailing.

(Tr. 208–09; Pl. Exh. 6). Mr. Watts' positive evaluation of the plaintiff was echoed at trial by Chantal Sironneau, who had been corporate retail manager at Baccarat (Tr. 60, 71–72), and by Janet Jowdy, who replaced Mr. Watts as store manager. (Tr. 84, 94–95).

In October 1994, Jean Luc Negre became the new president of Baccarat, with ultimate authority for personnel decisions. (Tr. 78, 451). According to Ms. Rivera, she learned soon thereafter that she was being targeted for replacement. (Tr. 244). The plaintiff testified that Mr. Negre angrily told her that he did not like her attitude and did not want her to speak Spanish on the job. (Tr. 244, 246, 269). Further, he stated that he did not like her accent. (Tr. 244–45). At trial, the plaintiff explained that a customer had complained about employees speaking Spanish to each other. However, this arose when Ivette Brigantty, another Hispanic salesperson, initiated a conversation in Spanish with Ms. Rivera, who immediately told her in English that they should talk later. (Tr. 255–57).

After the 1994 Christmas season, Mr. Negre began making changes in the sales staff at Baccarat. First he terminated the interior designer, and then he replaced J.D. Watts as store manager with Janet Jowdy. (Tr. 458–59). On July 14, 1995, Dennis Russell, the chief financial officer of Baccarat, notified Ms. Rivera that she was terminated. (Tr. 275–76). In the presence of Ms. Jowdy,

Mr. Russell said that he knew what a good salesperson the plaintiff was, but that the termination decision had been made by Mr. Negre. (Tr. 276). When Ms. Jowdy left the room momentarily, Ms. Rivera pressed Mr. Russell to tell her why she was being fired. According to the plaintiff, he replied, "Irma, he wants younger, and he doesn't want Hispanics." (Tr. 277). Ms. Jowdy then returned, and Mr. Russell changed the subject of the conversation.

According to Ms. Rivera's testimony, Mr. Russell also mentioned Ivette Brigantty during the termination meeting. He said, "As you know, Ivette was terminated yesterday." When the plaintiff said, "Because she's Spanish, right?," Mr. Russell replied, "Yes." (Tr. 279).

When Ms. Rivera and Ms. Brigantty were terminated, two sales representatives remained. One was Helene Cohen, who is not Hispanic and who had worked at Baccarat since 1983. (Tr. 262, 550; Def. Exh. B). The other was Sammy Usmiani, who was also not Hispanic and had been hired about a month earlier. (Tr. 66–67, 262; Def. Exh. B).

The evidence presented by Baccarat painted a very different picture of the basis for Ms. Rivera's termination. Prior to becoming president of the company, Mr. Negre had made several unannounced visits to the retail store, and thereafter expressed his unhappiness with the sales staff. (Tr. 78, 88–89, 452–53). He found that the employees were not friendly or attentive enough and did not approach customers at the entrance to the store. (Tr. 78, 89, 452–53). As part of an effort to revitalize sales, Mr. Negre asked Ms. Jowdy, the newly hired store manager, to assess each salesperson. Ms. Jowdy quickly decided that Ms. Brigantty could not do the work and some time thereafter reached the same conclusion with respect to the plaintiff. (Tr. 460, 486–87, 502). Mr. Negre testified that he therefore terminated Ms. Rivera because of "[t]he attitude toward the customers, the way the customer got treated, the way we do follow up with customers. It wasn't done in the proper way." (Tr. 460). Ms. Rivera's termination report, signed by Ms. Jowdy, contains an overall

negative evaluation of her performance. (Tr. 107–08; Pl. Exh. 2). However, at trial Ms. Jowdy had no recollection of completing the report and disavowed much of its content. (Tr. 107–08). Mr. Negre also fired Ms. Brigantty, but retained Ms. Cohen because of Ms. Jowdy's opinion that she had a good attitude and understood the changes that the new management wanted implemented. (Tr. 461).

In response to the plaintiff's evidence concerning her sales success, Mr. Negre testified that the sales figures were misleading. He contended that before he became president, the store achieved sales volume by discounting prices, which in turn diminished profitability. (Tr. 483–84).

With respect to the plaintiff's testimony that she was told not to speak Spanish, Mr. Negre testified that the only rule was that, as a matter of courtesy, employees should not speak Spanish (or another foreign language) among themselves in the presence of customers or co-workers who speak only English. (Tr. 464, 533–34). Ms. Sironneau, Ms. Jowdy, and Ms. Cohen each confirmed that this was the guideline at Baccarat, and that there was no general rule against speaking Spanish. (Tr. 70–71, 80, 123, 556–67).

Finally, Baccarat presented evidence of the ethnic diversity of its sales staff. After Ms. Rivera's termination, the store hired an Austrian woman as an assistant manager, a Brazilian woman who speaks Spanish and Portuguese, and a Japanese man. (Tr. 467–69). Baccarat also retained an Hispanic man who works in the stock room. (Tr. 461, 562).

Ms. Rivera went on vacation the month after her discharge in July 1995. (Tr. 301–02). Upon her return, she sought new employment, and in October she was hired as a salesperson by Bernardaud, a distributor of fine tableware. (Tr. 290, 293, 373). Bernardaud laid off the plaintiff in July 1996 when it was in the process of relocating its store (Tr. 292–93, 377–78), and she is now working in the bridal registry department of a Bloomingdales store on Long Island. (Tr. 294–95).

On the basis of the evidence, the jury found that Baccarat terminated Ms. Rivera on the basis of her national origin in violation of Title VII. The evidence presented in connection with damages will be discussed below.

*Discussion*

A. *Judgment as a Matter of Law*

Baccarat's first argument is that it is entitled to judgment as a matter of law because the plaintiff failed to present sufficient evidence of national origin discrimination. Ms. Rivera responds by identifying several categories of evidence demonstrating the discriminatory animus of Jean Luc Negre, the relevant decisionmaker. First, she points to testimony that Mr. Negre told her not to speak Spanish as proof that Baccarat had a discriminatory "English-only" rule. Next, she argues that Mr. Negre's criticism of her accent is evidence of bias. Third, the plaintiff contends that Mr. Russell's statements to her in her termination meeting provide direct proof of discriminatory intent. Finally, she argues that Baccarat's firing of two Hispanic sales representatives while it retained only non-Hispanic salespersons demonstrates discrimination.

Judgment as a matter of law may only be granted if there is a complete absence of evidence supporting the jury's verdict or if the evidence in favor of the moving party is so overwhelming that no reasonable and fair-minded person could arrive at a verdict against it. *Galdieri–Ambrosini v. National Realty & Development Corp.,* 136 F.3d 276, 289 (2d Cir.1998); *Luciano v. Olsten Corp.,* 110 F.3d 210, 214 (2d Cir.1997); *Cruz v. Local Union No. 3,* 34 F.3d 1148, 1154 (2d Cir.1994). In assessing the record, the court must view the evidence in the light most favorable to the party opposing the motion and must draw all reasonable inferences in favor of that party. *Galdieri–Ambrosini,* 136 F.3d at 289; *Vasbinder v. Ambach,* 926 F.2d 1333, 1339 (2d Cir.1991). Further, the court may not weigh the testimony of the witnesses, but must defer to the jury's credibility determinations. *Galdieri–Ambrosini,* 136 F.3d at 289; *Vasbinder,* 926 F.2d at 1339.

In light of this standard, Baccarat's motion must be denied. The weakest link in the plaintiff's case is the evidence of an En-

glish-only policy. Every witness who testified about this issue except for Ms. Rivera herself denied the existence of any rule at Baccarat forbidding the use of Spanish or other foreign languages. (Tr. 80, 123, 464, 556). The plaintiff's testimony itself was ambiguous. Although she stated that Mr. Negre ordered her not to speak Spanish, she acknowledged that this arose in the context of a conversation in Spanish between employees in the presence of a customer who did not speak that language. (Tr. 244, 246, 253, 255–56). Further, Ms. Rivera agreed that as a matter of courtesy it was inappropriate to speak in front of a customer in a language the customer does not understand. (Tr. 256). Accordingly, there was no proof that Baccarat had an English-only policy as distinguished from a common sense rule against offending customers. There is no evidence that the defendant had the type of policy that would "create an atmosphere of inferiority, isolation and intimidation based on national origin that could result in a discriminatory working environment." 29 · C.F.R. § 1601.7(a). Therefore, in determining Baccarat's motion, I am disregarding the contention that the defendant had an English-only policy.

 However, the plaintiff fares better with her argument that her accent was a factor in her termination. Under Equal Employment Opportunity Commission regulations, national origin discrimination includes "the denial of employment opportunity because ... an individual has the ... linguistic characteristics of a national origin group." 29 C.F.R. § 1606.1. "Accent and national origin are obviously inextricably intertwined in many cases." *Fragante v. City and County of Honolulu*, 888 F.2d 591, 596 (9th Cir.1989). Thus, unless an employee's accent materially interferes with her job performance, it cannot legally be the basis for an adverse employment action. *Id.; see also Carino v. University of Oklahoma Board of Regents*, 750 F.2d 815, 819 (10th Cir.1984) (plaintiff with Filipino accent improperly denied position where accent did not interfere with ability to perform tasks); *Berke v. Ohio Department of Public Welfare*, 628 F.2d 980, 981 (6th Cir.1980) (employee improperly denied two positions because of accent); *Liberman*

*v. Brady*, 926 F.Supp. 1197, 1207–11 (E.D.N.Y.1996) (supervisor's remark that employee should not work at front desk because "people would possibly be offended because of his accent" showed discriminatory intent).

In this case, Ms. Rivera testified that during her one face-to-face meeting with Mr. Negre, he specifically stated that he did not like her accent. (Tr. 244–45, 269, 339–40). While Baccarat characterizes this as a single stray remark insufficient to support a finding of discriminatory intent, its probative value, if credited, is substantial. It is a statement by the president of the company who himself made the decision to terminate Ms. Rivera. Moreover, it occurred in the context not of a casual conversation with others, but in the meeting where he was offering the plaintiff his opinion of her performance shortly before she was terminated. *See Wold v. Fellows Corp.*, 987 F.Supp. 662, 666 (N.D.Ill.1997) (single discriminatory remark probative when made by decisionmaker contemporaneous with plaintiff's termination). It is no less probative of bias than if a supervisor says to an employee shortly before firing her, "I don't like the color of your skin."

As against these facts, which the jury was entitled to credit, the cases cited by Baccarat are inapposite. The Court of Appeals decision in *Spence v. Maryland Casualty Co.*, 995 F.2d 1147 (2d Cir.1993), for example, turned on whether the defendant's treatment of the plaintiff was so egregious as to constitute a constructive discharge. *Id.* at 1158. Similarly, in *Bellom v. Neiman Marcus Group, Inc.*, 975 F.Supp. 527, 532 (S.D.N.Y.1997), the court granted summary judgment because a supervisor's mimicking of the plaintiff's accent on one or two occasions was merely the equivalent of a stray remark. *See also Stallcop v. Kaiser Foundation Hospitals*, 820 F.2d 1044, 1050–51 (9th Cir.1987) (single remark that plaintiff did not know English made year or two prior to termination by supervisor who was not identified as being involved in discharge decision; not a Title VII case); *Hill v. K–Mart Corp.*, 699 F.2d 776, 778 (5th Cir.1983) (no hostile environment claim based on company's alleged failure to address racial slurs made to plain-

tiff by her subordinates). Here, Ms. Rivera did not contend that Mr. Negre's remarks were so upsetting or pervasive that they forced her to resign or created a hostile environment. Rather, she argues that they provide evidence of discriminatory animus. They do, and they are properly considered in evaluating the sufficiency of the plaintiff's case.

■ Even more difficult to overcome is the evidence that Mr. Negre indicated to Mr. Russell that he did not want Hispanic salespersons. (Tr. 277). Baccarat argues that Ms. Rivera's testimony on this point is wholly incredible because it is inconsistent with her own pretrial testimony and is contradicted by Mr. Russell's deposition evidence. These inconsistencies will be explored in more detail below, but for present purposes it is sufficient to reiterate that the Court may not second-guess the jury's credibility determinations on a motion for judgment as a matter of law. Ms. Rivera testified to an apparent admission by Mr. Negre that he did not want Hispanics at Baccarat, and that is strong evidence of discriminatory intent.

■ Finally, the jury could legitimately have viewed the evidence concerning the ethnic make-up of Baccarat's sales force as supporting the plaintiff's claim. Ms. Rivera was fired at the same time as Ms. Brigantty, another Hispanic sales representative. The only salesperson retained from the period prior to Mr. Negre's becoming president was Ms. Cohen, who is not Hispanic.

While Baccarat presented evidence that the staff subsequently hired was ethnically diverse, the jury was entitled to discount that proof. Only one of the new hires was arguably Hispanic, and she was Brazilian, so that her native language is Portuguese, not Spanish. Furthermore, the Hispanic employee who was retained worked in the stock room, not on the sales floor where employees deal with customers. An employer who discriminates on the basis of national origin acts illegally even if he is not biased against everyone whose national origin differs from his. Title VII forbids both selective discrimination and general xenophobia. Thus, the jury could have found that Baccarat's hiring pat-tern reflected discrimination against Hispanics even if not against other ethnic groups.

Three of the four categories of evidence presented by the plaintiff, then, provide some support for her claim of national origin discrimination. Mr. Negre's criticism of her accent, his statement that he did not want Hispanic sales employees, and the fact that two Hispanic sales representatives were discharged while the non-Hispanic salesperson was retained all buttress the jury's finding of liability. Accordingly, Baccarat's motion for judgment as a matter of law is denied.

### B. New Trial

■ In contrast to the standard for judgment as a matter of law, in determining whether to order a new trial the court may weigh conflicting evidence and need not view the record in the light most favorable to the nonmoving party. *Song v. Ives Laboratories, Inc.*, 957 F.2d 1041, 1047 (2d Cir.1992); *Loral Fairchild Corp. v. Victor Co. of Japan, Ltd.*, 931 F.Supp. 1014, 1034 (E.D.N.Y.1996). If the court is convinced that the verdict is seriously erroneous because it is against the weight of the evidence or constitutes a miscarriage of justice, it should order a new trial. *See Piesco v. Koch*, 12 F.3d 332, 344–45 (2d Cir.1993); *Smith v. Lightning Bolt Productions, Inc.*, 861 F.2d 363, 370 (2d Cir. 1988). However, matters of credibility remain the sole province of the jury. *See Sorlucco v. New York City Police Department*, 971 F.2d 864, 875 (2d Cir.1992).

■ Misconduct by counsel is also a basis for ordering a new trial. *See Pappas v. Middle Earth Condominium Association*, 963 F.2d 534, 539–40 (2d Cir.1992). But to warrant relief, such misbehavior must have been sufficiently egregious to have prejudiced the movant and prevented a fair trial. *Id.* at 540.

#### 1. Misconduct by Counsel

In this case, the plaintiff's attorney, Joseph C. Maya, repeatedly tested the limits of appropriate trial conduct, sometimes overstepping those boundaries. However, Baccarat has been unable to demonstrate that these instances, either individually or collectively,

caused it prejudice. Indeed, on many occasions, counsel for the defendant chose not to object to the conduct they now seek to characterize as egregious. In other instances, their objections to inadmissible evidence or to inappropriate argument were sustained, minimizing the possibility of prejudice.

### a. *Playing the Race Card*

■ Baccarat argues that the plaintiff and her attorney improperly injected the issue of race into this case despite the fact that Ms. Rivera claimed discrimination only on the basis of age and national origin. According to the defendant, this was accomplished in several ways. First, when questioned about the national origin of two other employees terminated by Baccarat, Ms. Rivera responded that they were Afro–American. (Tr. 267, 283, 399). Second, Mr. Maya argued that Loretta Brown, a black former employee who testified in this case, was fired because of "the color of her skin." (Tr. 676). Baccarat contends that Ms. Brown should not even have been permitted to testify because it was never demonstrated that she was terminated by the same decisionmaker as Ms. Rivera. Finally, plaintiff's counsel argued to the jury that Baccarat's work force was not as diverse as the defendant contended, and he challenged the jury to determine whether Hispanics or Afro–Americans were represented. (Tr. 685–86).

This alleged misconduct does not warrant a new trial. Baccarat's counsel did not object either when Ms. Rivera was asked about the national origin of two other employees or when she responded that it was Afro–American. (Tr. 267, 283). Nor did counsel object when she was asked whether any Caucasian employee was terminated. (Tr. 283). Baccarat's attorney did object when Ms. Rivera was asked whether one of the Afro–Americans was terminated because of his national origin, and I sustained the objection.

With respect to Loretta Brown, there was ample evidence that Jean Luc Negre, who made the decision to terminate Ms. Rivera, was responsible for all personnel decisions in the retail store. (Tr. 78, 96, 457–61). Thus, the jury was entitled to conclude that although other supervisors notified Ms. Brown of her discharge, just as Mr. Russell notified the plaintiff of hers, the ultimate decision-maker in both instances was Mr. Negre. Moreover, apart from testimony about her own termination, Ms. Brown presented relevant evidence about Ms. Rivera's performance. (Tr. 166–67). Mr. Maya's suggestion in summation that Ms. Brown was fired because of her skin color was, of course, wholly improper. However, I immediately sustained the objection by Baccarat's counsel and reprimanded Mr. Maya before the jury. (Tr. 676). Baccarat sought no further relief.

■ Finally, Mr. Maya's invitation to the jury to determine whether specific minority groups had been excluded from Baccarat's work force was a fair response to the defendant's argument that its staff was diverse. Certainly, Baccarat is not legally obligated to hire employees from every identifiable ethnic or national grouping. However, once the defendant presented a picture of the diversity of its employees, as it did from opening argument in this case, the plaintiff was entitled to argue that Baccarat was at least "selectively" discriminatory.

### b. *Mischaracterizing the Evidence*

■ Baccarat also argues that in his closing argument plaintiff's counsel repeatedly mischaracterized the evidence. Indeed, in many instances Mr. Maya's hyperbole went beyond the bounds of vigorous advocacy. For example, he stated that Mr. Negre had testified that "discrimination is silly" (Tr. 664), when in fact the witness used the work "silly" to describe the suggestion that he had withheld Ms. Rivera's vacation pay. (Tr. 529). Similarly, Mr. Maya argued that Chantal Sironneau did not want to be associated with Baccarat because it discriminated. (Tr. 680). There is simply no evidence that would support this statement. Such mischaracterizations, while unprofessional, were not sufficiently prejudicial to Baccarat to warrant a new trial. They generally concerned collateral matters, and in none of these instances did Baccarat's counsel object.

Other alleged mischaracterizations cited by Baccarat had at least a colorable basis in the evidence. For example, Mr. Maya argued that although Baccarat failed to produce in

discovery any customer commendations of Ms. Rivera, Loretta Brown had testified about "an entire stack of commendations." (Tr. 677). In discovery, the plaintiff had indeed made discovery requests broad enough to encompass such commendations, and Ms. Brown did testify to seeing a file for Ms. Rivera that contained throughout "commendations on how well she did." (Tr. 167). Similarly, Mr. Maya stated that Dennis Russell and Janet Jowdy had both recommended terminating Helene Cohen. (Tr. 679). Though he altered his testimony on cross-examination, Mr. Negre did state on direct questioning that Mr. Russell had recommended firing Ms. Cohen. (Tr. 461, 491–92). And, although Mr. Negre stated that Ms. Jowdy recommended retaining Ms. Cohen (Tr. 461), he also testified that Ms. Jowdy had criticized her for some of the same failings that resulted in the plaintiff's termination. (Tr. 535–36).

In the context of the trial as a whole, then, Mr. Maya's misstatements of the evidence in his summation were not serious enough to deprive Baccarat of a fair trial. Defendant's counsel never objected at trial to the alleged mischaracterizations and never sought an opportunity to rebut opposing counsel's representations.

### 2. *Perjury*

■■■ Baccarat's most compelling argument for a new trial is its contention that key portions of the plaintiff's testimony were fabricated and that the jury's verdict was therefore against the weight of the evidence. Ms. Rivera testified as follows at her deposition concerning the meeting in which Mr. Russell told her that she was terminated:

Q. And what do you recall Mr. Russle [sic] saying to you?

A. Mr. Russle [sic] told me that they were very happy with my work, that I was a very good team player, that I had done wonderful sales with corporates and retail, that they had no complaint about me, I was always there, but, unfortunately, they were dismissing me. As of that day I was to pick everything up, clear my locker and

leave and take your time but you leave today.

(Tr. 311).

Q. After having heard what Mr. Russle [sic] said, what, if anything, did you say?

A. Why, I asked why?

Q. Did he respond to you?

A. Yes.

Q. What did he say?

A. He said that "you're not the only one, they're doing this to everybody else. I am also included." He included himself.

. . . . .

Q. What, if anything else did he say during the meeting?

A. I do not remember everything he said.

Q. Do you remember anything else he said?

A. He kept on apologizing to me for what was happening and that not to take it personal.

Q. What did he say to you specifically, "I'm sorry?"

A. Yes.

Q. "We are sorry?"

A. Yes. He said, "Do not take it personal. You're a very good salesperson." He praised me. And then I said, "Why? If I'm so great, why?"

Q. And then his response was what?

A. His response was that they were doing this not only to me, they had dismissed someone else the day before.

(Tr. 312–13).

At trial, however, Ms. Rivera made dramatic additions to her version of this conversation. First she testified as follows:

Q. During this discussion related to your termination, what, if anything, did Mr. Russle [sic] say to you?

A. Mr. Russle [sic] told me that the decision had been made by Mr. Jean–Luc [sic] Negre that I was no longer to be employed at Baccarat. But Mr. Russle [sic] said to me, "Now, Irma, I don't want you to take this personally because I know and I see what a good salesperson you are. You are a team player. You get along with everybody. We never have problems with you."

As a matter of fact, they would have to give me my sick days at the end of the year because I was always there. If I got sick, I never took all my sick days. There was no problem. "We don't want you to take this personally. I don't want you to feel bad about it. It's just been decided." So I said to him, "Now, you're telling me how great I am, how much money I make, especially in corporate accounts you mentioned," because he did mention that, "then why are you firing me? Why am I being fired?" He said, "Because Mr. Jean–Luc [sic] Negre doesn't want you here anymore."

He wouldn't answer directly until Ms. Jowdy left the office for a second. She went to make some copies that they have to give me. Then he pulled me on the side and he said, "Irma, here is my business card. If you need any further assistance, if you apply for a job, tell them to call me." I said, "Mr. Russle [sic], why am I being fired?" Very nervously he looked around and said, *"Irma, he wants younger and he doesn't want Hispanics."*

(Tr. 276–77) (emphasis added). The plaintiff later added the following testimony:

Q. Did Mr. Russle [sic] tell you that the other Hispanic was also going to be terminated?

A. At the time he said to me, "As you know, Ivette [Brigantty] was terminated yesterday." She had been terminated the day before I. I said, "Yes. Because she's Spanish, right?" "Yes."

(Tr. 279).

When confronted with the inconsistencies between her trial and deposition testimony, the plaintiff asserted that during her deposition the examining attorney failed to ask questions specific enough to elicit her knowledge about the damning statements attributed to Mr. Negre.[2] (Tr. 315–16, 394–95).

Specifically, she argued that she did not consider her "off-the-record" discussion with Mr. Russell outside the presence of Ms. Jowdy to be part of the termination meeting she had been asked about. (Tr. 313–14, 319–20). This rationalization does not bear scrutiny. The questions her attorney asked Mr. Rivera at trial were just as broad as those posed by opposing counsel at her deposition. (Tr. 426–28). Yet her answers were markedly different.

Only two explanations are possible. The first is that Ms. Rivera simply lied on the witness stand in order to bolster her case. The second is that she told the truth at trial but previously withheld evidence in the discovery process by failing to respond honestly to deposition questions. The issue now to be addressed is whether a new trial is warranted under either circumstance.

Courts have been less than consistent in dealing with apparently perjurious trial testimony. In *Air–Sea Forwarders, Inc. v. Air Asia Co.*, 880 F.2d 176, 190 (9th Cir.1989), the Ninth Circuit affirmed the grant of a new trial where the district court found a key witness' testimony to be incredible because it was inconsistent with his prior deposition testimony. The court held that for purposes of a motion for a new trial, the district court was free to reject the witness' testimony. *Id.* Similarly, in *Isley v. Motown Record Corp.*, 69 F.R.D. 12, 16–17 (S.D.N.Y.1975), the court granted a new trial where a witness did a "testimonial about-face" in relation to his deposition testimony. Although the court recognized that "[f]requently, in directing a new trial, a court is faced with the fact that a second jury can do no more than reappraise the same evidence heard on the first trial," it noted that additional witnesses would be available in that case to corroborate or refute the witness' revised testimony. *Id.* at 16. Finally, in *Davis v. Jellico Community Hos-*

2. Mr. Russell's statement that Mr. Negre "doesn't want Hispanics" could be construed as Mr. Russell's assessment of Mr. Negre's motivation as opposed to a reflection of Mr. Negre's own words. However, Baccarat has never made this argument. Further, Mr. Russell's earlier comment that Mr. Negre "doesn't want you here anymore" seems to refer to a conversation between Mr. Negre and Mr. Russell. In this con-

text, it would not be irrational for the jury to have interpreted all of Mr. Russell's testimony as a paraphrase of Mr. Negre's statements to him. *See Wold*, 987 F.Supp. at 665–66 (reasonable to infer that statement relating decisionmaker's reason for termination was *reporting decisionmaker's* "*stated* discriminatory intent rather than just reading his mind").

329

*pital Inc.*, 912 F.2d 129 (6th Cir.1990), the Sixth Circuit set forth its standard for granting a new trial based on false testimony:

A new trial should be granted where the court is reasonably well satisfied that the testimony given by a material witness is false; that, without it, a jury might have reached a different conclusion; that the party seeking the new trial was taken by surprise when the false testimony was given and was unable to meet it or did not know of its falsity until after trial.

*Id.* at 134 (quoting *Gordon v. United States*, 178 F.2d 896, 900 (6th Cir.1949)).

In the Second Circuit, it is clear that the district court may not determine that a jury verdict is against the weight of the evidence simply because the trial judge believes that testimony has been fabricated. In *Sorlucco v. New York City Police Department*, 780 F.Supp. 202, 214–16 (S.D.N.Y.), *rev'd*, 971 F.2d 864 (2d Cir.1992), the trial court found that the plaintiff's testimony that she did not sign a critical document was contradicted by the document itself and by the testimony of a disinterested witness. *Id.* at 206. The court concluded that the plaintiff's "sworn denial that she knowingly signed the statement raises the strong inference that she perjured herself on that critical issue." *Id.* at 215. The court went on to reason that "[a] verdict based on perjury is one example of the injustice to be avoided through the grant of a new trial, if necessary." *Id.* (citation omitted).

However, the Court of Appeals reversed the decision of the district court granting a new trial. *Sorlucco*, 971 F.2d at 875. The court held that the veracity of the plaintiff's statement was a "matter of credibility for the jury to resolve." *Id.* It reasoned:

[T]his is not a case where contradictory evidence subsequently comes to light revealing a perjury that would warrant a new trial. All the conflicting versions, if they were conflicting, were before the jury.

. . . . .

Under the circumstances, we think that the trial court overstepped its bounds and usurped the jury's function of judging credibility.

*Id.* (citation omitted); *see also Bruneau v. South Kortright Central School*, 962 F.Supp. 301, 304 (N.D.N.Y.1997) (court may not override jury's credibility determination).

*Sorlucco* controls this case. Acting as a finder of fact, I might well have reached a different verdict from the jury. In light of the direct contradiction between Ms. Rivera's trial testimony and her deposition, I would not have credited her allegations about the dramatic admissions attributed to Mr. Negre. But disregarding the plaintiff's questionable testimony is precisely what *Sorlucco* forbids me to do. As in that case, the contradictions were fully presented to the jury. Baccarat's counsel took full advantage of Mr. Russell's deposition testimony and of Ms. Rivera's own prior deposition to impeach her. Baccarat has not come forth with any new evidence, unavailable to it at trial, that would further demonstrate that the plaintiff committed perjury. Therefore, I cannot grant a new trial on that basis.

 Baccarat fares no better based on the alternative hypothesis that Ms. Rivera improperly withheld information at her deposition. Violation of discovery obligations may result in the imposition of sanctions, including the preclusion of evidence. However, "[s]urprise does not warrant a new trial unless it deprives the party of a fair hearing." *Brady v. Chemical Construction Corp.*, 740 F.2d 195, 200 (2d Cir.1984) (citation omitted). Here, Baccarat has not demonstrated that it was prejudiced by Ms. Rivera's deviation from her deposition testimony. When confronted with the new testimony at trial, Baccarat neither sought a continuance nor moved for a mistrial. *See Twigg v. Norton Co.*, 894 F.2d 672, 675 (4th Cir.1990) (timely motion for a mistrial made). Furthermore, since that time, the defendant has never suggested how its trial strategy might have been different had it had fair warning of the plaintiff's ultimate testimony. It has not identified any additional witnesses or documents that it might have used to impeach her. Rather, defense counsel used the most devastating means of impeachment available: Ms. Rivera's own words. Nevertheless, the jury believed her.

## C. *Damages*

Baccarat contends that even if the jury's verdict on liability must stand, the damage award was excessive, requiring a new trial on damages or a remittitur. A threshold issue concerns the appropriate "order of operations" in dealing with an excessive damage argument where the award will also be subject to a statutory cap. The record in this case reveals that Baccarat had 80–90 employees during the relevant period. (Tr. 471). Therefore, notwithstanding the jury's verdict, the Civil Rights Act of 1991 dictates that the total compensatory and punitive damages awarded may not exceed $50,000. 42 U.S.C. § 1981a. It is conceivable that, in the interest of judicial economy, a court might reduce a verdict to the statutory maximum first, and only then consider whether that diminished amount is so excessive that relief is warranted. This approach may save effort in those cases where it is obvious that damages in the amount of statutory cap would be reasonable regardless of the magnitude of the original verdict. *Cf. Franz v. Kernan*, 951 F.Supp. 159, 162–63 (E.D.Mo.1996) (award first reduced to statutory cap, then motion for new trial on damages denied in light of reduction; no explicit finding that reduced amount not excessive).

The better approach, however, is to determine first whether each component of the damage verdict is excessive. If, after reducing each to the maximum reasonable amount, the total still exceeds the statutory cap, then the overall award can be reduced further. This strategy avoids the need to make a somewhat arbitrary allocation of the capped award between different categories of damages, and it best preserves for appellate review the rationale underlying the trial court's decision. *See Williams v. Pharmacia Opthalmics, Inc.*, 926 F.Supp. 791, 793–94 (N.D.Ind.1996) (after reducing award to statutory cap, court allocates entire amount to compensatory damages without prejudice to reinstating punitive damage award if compensatory award is reduced on appeal), *aff'd*, 137 F.3d 944 (7th Cir.1998). I will therefore proceed first to determine whether the jury's damage verdict in this case was excessive.

### 1. *Compensatory Damages*

In considering a claim that the jury awarded excessive damages, the court must construe the evidence in the light most favorable to the prevailing party. *See Scala v. Moore McCormack Lines, Inc.*, 985 F.2d 680, 683 (2d Cir.1993); *Blissett v. Eisensmidt*, 940 F.Supp. 449, 457–58 (N.D.N.Y. 1996). Nevertheless, where, as here, a damage award is based on federal substantive law, it may be overturned if it is so excessive that it shocks the conscience of the court. *See Lee v. Edwards*, 101 F.3d 805, 808 (2d Cir.1996); *Scala*, 985 F.2d at 683; *Iannone v. Frederic R. Harris, Inc.*, 941 F.Supp. 403, 413–14 (S.D.N.Y.1996). "While a jury has broad discretion in measuring damages, it may not abandon analysis for sympathy for a suffering plaintiff and treat an injury as though it were a winning lottery ticket." *Scala*, 985 F.2d at 684 (citations and internal quotations omitted).

In this case, the jury awarded Ms. Rivera $125,000 in compensatory damages for the mental and emotional distress she suffered as a consequence of being terminated because of her national origin. The plaintiff testified that since her discharge she feels nervous and is unable to sleep. (Tr. 296–99). She becomes anxious at her current job, especially when she encounters a customer she remembers from Baccarat. (Tr. 297–98). Ms. Rivera further testified that she has difficulty socializing because she tends to become irritable or depressed (Tr. 299–300), and that she experiences stomachaches because of her anxiety. (Tr. 301). Two of the plaintiff's daughters testified that after her discharge she was emotionally depressed and anxious. (Tr. 432–35, 440–41).

On the other hand, whatever distress Ms. Rivera felt did not prevent her from engaging in major activities soon after her termination. Within a month of her discharge, the plaintiff went on a previously scheduled vacation to Korea. (Tr. 301–02). By October, she had secured new employment at Bernardaud. (Tr. 373). For at least a year after being fired from Baccarat, Mr. Rivera sought no medical attention or psychological counseling, and she treated her symptoms only with an herbal remedy she obtained from a

health food store. (Tr. 302, 383–84). In July or August 1996, the plaintiff did consult a physician who prescribed tranquilizers for her. (Tr. 304–06, 384). However, this was immediately after she had been terminated from her job at Bernardaud. (Tr. 385–86). Other factors, including the illness of her mother, also affected Ms. Rivera's emotional well-being in this period. (Tr. 436).

■■■■ Because "there is no ready device, other than wholly speculative judgments as to credibility" for determining whether a claim of emotional distress has merit, it is appropriate "to assert judicial control over the size of damage awards for emotional injury in individual cases." *Ragin v. New York Times Co.*, 923 F.2d 995, 1005 (2d Cir. 1991). One means of doing so is to examine awards in similar cases. *Lee*, 101 F.3d at 812. The court's role, however, is to determine whether the award is "within reasonable range;" it is not to "balance the number of high and low awards and reject the verdict ... if the number of lower awards is greater." *Ismail v. Cohen*, 899 F.2d 183, 187 (2d Cir.1990).

In light of this standard and the evidence in this case, it is clear that the award to Ms. Rivera was excessive. Although she provided subjective testimony concerning her distress, she did not seek treatment until after she was fired from a subsequent job. *See Cowan v. Prudential Insurance Co. of America*, 852 F.2d 688, 691 (2d Cir.1988) (failure to seek counseling one factor considered in reducing damages for race discrimination); *McIntosh v. Irving Trust Co.*, 887 F.Supp. 662, 665 (S.D.N.Y.1995) (plaintiff failed to seek medical help for emotional distress). Nor was the plaintiff publicly humiliated. Although, according to her testimony, she learned of the discriminatory basis for her discharge, Baccarat did not publicize its reasons, real or pretextual, for terminating her. *See Cowan*, 852 F.2d at 690–91 (absence of overt racism and public humiliation justifies lesser damages). And, as noted above, the plaintiff's termination by Baccarat was not the only factor weighing on her mind: she was also fired from Bernardaud, and she had to deal with her mother's illness.

Cases with similar fact patterns have consistently resulted in more modest verdicts. For example, in *Cowan, id.* at 690–91, the discriminatory failure to promote the plaintiff caused him distress, humiliation, and a loss of self-esteem. He had serious disagreements with his wife and began drinking heavily. *Id.* Yet the Second Circuit approved an award of $15,000 rather than the $50,000 to $150,000 that the plaintiff argued for. More recently, in *McIntosh*, 887 F.Supp. at 663–64, the court granted remittitur to $20,000 from a compensatory damage award of more than $200,000 for emotional distress as the result of a retaliatory discharge. There, the plaintiff had testified that as a result of his termination he was angry and depressed, avoided his family at holidays, and felt inadequate because his wife was forced to support him. *Id.* at 664. But like Ms. Rivera, the plaintiff did not curtail his life activities and did not promptly seek professional medical or psychological help. *Id.* at 665. The court in *McIntosh* went on to identify numerous discrimination cases decided under the New York Human Rights Law, N.Y. Exec. L. § 296, in which verdicts for emotional distress were reduced to a range of from $5,000 to $15,000. *Id.* at 666–68. Likewise, in *Kim v. Dial Service International, Inc.*, No. 96 Civ. 3327, 1997 WL 458783 (S.D.N.Y. Aug.11, 1997), the court found $25,000 to be an appropriate award for emotional distress on the basis of evidence similar to that here, and it cited numerous cases reducing awards to that range. *Id.* at *12–*13.

The cases cited by the plaintiff as justification for a large verdict here are inapposite. In *Ramirez v. New York City Off–Track Betting Corp.*, No. 93 Civ. 682, 1996 WL 210001 (S.D.N.Y. April 30, 1996), *aff'd in relevant part*, 112 F.3d 38 (1997), for example, the court observed that:

> Dramatic evidence was admitted at trial demonstrating that the loss of employment, the loss of health insurance and benefits, and the emotional pain of being arbitrarily and summarily dismissed aggravated plaintiff's psychological problems to such an extreme extent that he ceased to be able to function in society. Further, there was substantial evidence to support a

finding that this inability to function would persist indefinitely into the future. *Id.* at \*6 (awarding $500,000 for extreme emotional distress). Here there was no such evidence. Similarly, in *Moody v. Pepsi–Cola Metropolitan Bottling Co.*, 915 F.2d 201, 204 (6th Cir.1990), a $150,000 award for emotional distress was warranted in part because the plaintiff's discharge necessitated his taking a new job in a different state apart from his family, as a result of which his marital relationship suffered. In *New York City Transit Authority v. State Division of Human Rights*, 181 A.D.2d 891, 185 A.D.2d 889, 581 N.Y.S.2d 426 (2d Dep't 1992), the court affirmed a $450,000 award under the New York Human Rights Law in light of what the Division of Human Rights hearing officer described as "the most shocking instance of abuse of an employee by an employer" in his 20–year experience. *Id.* 181 A.D.2d at 894, 581 N.Y.S.2d at 429. This involved the employer denying light duty to a pregnant employee who had submitted doctors' letters indicating the medical necessity of her avoiding the rigors of her usual duties; as a consequence of being forced to continue on full duty she suffered a miscarriage. The employer then forced her to undergo psychiatric testing before returning to work. *Id.* 181 A.D.2d at 892–93, 581 N.Y.S.2d at 428. Nothing close to that occurred in Ms. Rivera's case. *See also 119–121 East 97th Street Corp. v. New York City Commission of Human Rights*, 220 A.D.2d 79, 85–87, 642 N.Y.S.2d 638, 642–43 (1st Dep't 1996) ($100,-000 award for 18–month harassment of tenant suffering from AIDS).

The compensatory damage award made by the jury in the instant case, then, was clearly excessive. In light of the comparable cases cited above and the evidence presented at trial, the maximum amount that would compensate Ms. Rivera for her emotional distress and not shock the conscience of the court is $20,000. *See Earl v. Bouchard Transportation Co.*, 917 F.2d 1320, 1330 (2d Cir.1990) (in reducing damage award, district court should remit to maximum amount that would be upheld as not excessive); *Niemann v. Whalen*, 928 F.Supp. 296, 298–99 (S.D.N.Y. 1996) (same), *aff'd mem.*, 107 F.3d 3, 1997 WL 62938 (2d Cir.1997).

### 2. *Punitive Damages*

Baccarat also challenges the jury's award of punitive damages, arguing both that the evidence does not support any exemplary damages and that the award of $375,000 was excessive. Punitive damages are available for a violation of Title VII where it is demonstrated that the defendant "engaged in a discriminatory practice or discriminatory practices with malice or with reckless indifference to the federally protected rights" of the plaintiff. 42 U.S.C. § 1981a(b)(1). While a simple finding of liability under Title VII does not justify an award of punitive damages, neither is a plaintiff required to show that the defendant's conduct was extraordinarily egregious. *See Luciano*, 110 F.3d at 219–20.

In this case, there was a sufficient evidentiary basis for the jury to find malice. Although Baccarat's president professed an understanding of his legal obligation not to discriminate, the jury was entitled to find on the basis of Ms. Rivera's testimony that he fired her specifically because of her national origin. Both the overt and direct nature of the discrimination and the harshness with which it was manifested against the employee justify an award of punitive damages. In *Ettinger v. State University of New York State College of Optometry*, No. 95 Civ. 9893, 1998 WL 91089 (S.D.N.Y. March 2, 1998), the court allowed a punitive damage award to stand (after reducing it) where there was a finding of retaliation but no direct discrimination and where, although the plaintiff's job duties were altered, she was not terminated. *Id.* at \*10–\*11. The more egregious discrimination that the jury found here likewise supports some award of exemplary damages.

Whether a punitive damage award is so large as to shock the conscience of the court is to be judged according to three factors identified by the Supreme court in *BMW of North America, Inc. v. Gore*, 517 U.S. 559, 575–83, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996):(1) the degree of reprehensibility of the defendant's conduct, (2) the proportion of punitive damages to compensatory damages, and (3) the relation of the damage award to other statutory remedies available

to redress similar wrongful acts. The Court developed this framework in connection with common law torts such as products liability, and it is not always clear that it can be comfortably applied in employment discrimination litigation. Nevertheless, courts have used the *Gore* analysis in civil rights and Title VII cases, *see Lee,* 101 F.3d at 809–12; *Ettinger,* 1998 WL 91089, at *10–*12, and I will do so here.

 The degree of reprehensibility of the defendant's conduct was moderate. As noted above, the jury necessarily found that Mr. Negre fired Ms. Rivera because she is Hispanic. But this does not rise to the level of sex harassment cases where discrimination is manifested by physical assault. Nor did the plaintiff demonstrate that Baccarat has engaged in repeated discriminatory acts. While she did show that another Hispanic woman was terminated at the same time, there was no evidence of a pattern of discrimination over time and no suggestion that Baccarat had been found liable in other cases.

The ratio of punitive to compensatory damages is a significant factor. The three-to-one relation between the jury's exemplary damage award and its assessment of compensatory damages might be sustainable. However, the jury's punitive damage award is more than eighteen times the $20,000 amount that more appropriately reflects the plaintiff's emotional distress.[3] This is excessive.

Finally, it is difficult to compare the punitive damages award here to penalties available under different statutory schemes applicable to comparable misconduct. The statutory cap for punitive and compensatory damages in this case is $50,000. Baccarat argues that this amount should be reserved for the most extreme cases and that the total award here should therefore be well below $50,000 because its conduct was not egregious. That analysis, however, is foreclosed by *Luciano,* where the court held that "[t]he statutory limitation is not an endpoint of a scale according to which judges might recalibrate jury awards." 110 F.3d at 221. On the other hand, if one looks to

analogous state law, punitive damages are not authorized at all under the New York Human Rights Law. *See Greenway v. Buffalo Hilton Hotel,* 143 F.3d 47, 50 n. 1 (2d Cir.1998); *Thoreson v. Penthouse International, Ltd.,* 80 N.Y.2d 490, 499, 591 N.Y.S.2d 978, 981, 606 N.E.2d 1369 (1992). Thus, this factor provides little guidance.

The purposes of punitive damages are to punish the defendant and deter both the offender and others from similar conduct in the future. *Vasbinder v. Scott,* 976 F.2d 118, 121 (2d Cir.1992). In view of these goals and the *Gore* factors discussed above, the jury's award in this case was excessive. Punitive damages in the amount of $40,000 would be sufficient to punish Baccarat and deter similar wrongful conduct, would be consistent with the reprehensibility of its violation, and would be proportionate to the actual injury suffered by Ms. Rivera.

### D. Relief

Normally, where a damage award is found to be excessive, the court may order a new trial on all issues or on damages alone or may grant remittitur. *Tingley Systems, Inc. v. Norse Systems, Inc.,* 49 F.3d 93, 96 (2d Cir.1995). Here, however, the statutory cap of $50,000 is less than the total of $20,000 in compensatory damages and $40,000 in punitive damages that I have found to be reasonable. This obviates the possibility of remittitur. Further, there is no basis for a new trial, since, as discussed above, the original proceedings were not tainted by legal error or prejudicial misconduct. Accordingly, it is appropriate simply to enter judgment for plaintiff for $50,000 in compensatory and punitive damages together with such back pay, attorneys' fees, and costs as will be determined in future proceedings.

### Conclusion

For the reasons set forth above, Baccarat's motion for judgment as a matter of law or for a new trial is denied. The award of compensatory and punitive damages shall be reduced to the statutory cap of $50,000.

---

**3.** The plaintiff's back pay award is yet to be calculated. However, because she promptly found new employment, that award will be modest and does not change this analysis.

Counsel shall contact chambers to schedule further proceedings.

SO ORDERED.